James I. BRIGGS, Appellant,

v.

UNITED STATES, Appellee.

No. 83–982.

District of Columbia Court of Appeals.

Argued Sept. 19, 1985.
Decided April 29, 1987.
As Amended May 8, 1987.

J. Philip Kessel, Washington, D.C., appointed by the court, for appellant.

Mary Ellen Abrecht, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. and Michael W. Farrell and Ronald Dixon, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before PRYOR, Chief Judge, and FERREN and BELSON, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of armed robbery, D.C.Code §§ 22–502, –3202 (1981 & 1986 Supp.), and carrying a pistol without a license, D.C.Code § 22–3204 (1981). The court sentenced him to consecutive prison terms of 14 to 42 years for the armed robbery and two to six years for carrying the pistol. Appellant presents three arguments on appeal: (1) the trial court erred in denying appellant's request to be present at bench conferences during *voir dire* of the jury panel; (2) the court abused its discretion by refusing defense counsel's request to recross-examine a police officer on a new matter raised during redirect examination; and (3) the court erred in failing to conduct an inquiry required by *Frendak v. United States,* 408 A.2d 364 (D.C.1979), to determine whether appellant had voluntarily and intelligently decided not to raise an insanity defense. We reject the first two

contentions but agree with the third. Accordingly, we remand the case for a *Frendak* inquiry.

## I. THE PROCEEDINGS

### A. *Mental Competency Hearings*

The police arrested appellant on the day of the crime, July 23, 1981. However, when a police officer accompanied him to a men's room, appellant escaped by producing a pistol and handcuffing the officer to a stall. Appellant eventually was apprehended and appeared in court with appointed counsel on December 12, 1981, six months after the crime. Appellant apparently was unable to make bond and thus remained incarcerated pending trial.

Another six months later on July 16, 1982, the day after his indictment, appellant wrote a letter to the court, from jail, asking for removal of his attorney and for permission to proceed *pro se*, because "only 'a man' can represent a man, 'as I am my own man.'" Appellant embellished his letter with illustrations, including a sketch of the seal of the United States and several drawings of a pyramid with an eye at the top, both symbols found on the back of a one dollar bill. At his arraignment on July 26, appellant reiterated his request to represent himself. The court ordered a forensic psychiatric examination. Appellant wrote another similarly illustrated letter to the court the next day, again asking to proceed *pro se*.

At a status hearing on August 16, 1982, appellant's counsel indicated on a checklist that appellant would not raise an insanity defense but would file motions to suppress identification and other evidence, and probably would present an alibi defense. After the status hearing, the court permitted appellant's counsel to withdraw. Appellant attempted to represent himself, filing a discovery motion and a motion to suppress identification. The court renewed its order to complete a forensic psychiatric examination to determine appellant's competency to stand trial. Appellant thereafter filed many unusual pleadings, containing more

drawings, biblical references, and some legal discussion.

On September 15, 1982, approximately 14 months after the crime, Kevin P. Donohue, M.D., Staff Psychiatrist of the Forensic Psychiatry Division, evaluated appellant in a detention setting. He wrote to the court the next day that in his opinion:

Briggs is alert and oriented in all spheres, however, he appears grossly delusional, believing the judge in his case to be "biased" and "out to destroy the children of Israel." He speaks in pseudo-legal jargon, challenging the right of the police to return him for identification to the scene of the alleged offense.

He refuses counsel stating that he can represent himself better because he knows the facts in the case and that he has "the grace of God."

I believe that Mr. Briggs is grossly delusional in such a way that he could not be expected to represent himself in the defense against such serious charges and would also have difficulty assisting professional counsel in preparing his defense.

Dr. Donohue recommended hospitalization in a psychiatric facility for evaluation and treatment of "what appears to be a serious thought disorder, paranoid schizophrenia."

On September 29, 1982 the court ordered further psychiatric examinations, this time both for competency and for productivity (*i.e.*, evidence of insanity at the time the offense was committed), to be conducted "on an inpatient basis in a hospital setting." On November 24, 1982, James L. Evans, M.D., another staff psychiatrist, wrote to the court that he had examined appellant on November 19 and that, in his opinion, appellant was "incompetent for trial by virtue of not having a rational as well as a factual understanding of the proceedings against him and not being able to consult with counsel with a reasonable degree of rational understanding." Dr. Evans did not address productivity.

At a status hearing on November 30, 1982, appellant, appearing with a new court-appointed "attorney-advisor," challenged the conclusion that he was incompetent to stand trial. His attorney requested the court to instruct the doctor to report on the reasons for his "conclusory" opinion to that effect. Next, after the court had explained to appellant the meaning of a productivity examination, appellant stated he would not cooperate out of a fear that anything he told the doctor about events on the day of the crime would be used against him in court and that, in any event, he was "not trying to plead any insanity defense." The court nonetheless again ordered an inpatient psychiatric examination as to both competency and productivity and also ordered the examining psychiatrist to be present at a competency hearing. The court specifically left open the possibility that appellant could refuse to answer any question bearing on productivity.

Richard M. Kapit, M.D., the third staff psychiatrist to examine appellant, wrote to the court on December 20, 1982 that he had examined appellant on December 16. In his opinion, appellant probably suffered from paranoid schizophrenia, although he thought appellant knew enough about psychiatry to avoid admitting information that would confirm this diagnosis. But, according to Dr. Kapit, appellant did show "observable signs of mental illness such as flat affect, loose associations, and total inability to consider alternatives to his own ways of thinking about things."

Dr. Kapit recommended that the court find appellant incompetent to stand trial primarily because his "rigidity and immobility of thinking" had made him "insensible to the influence of reality." Dr. Kapit further opined that an attorney-advisor would not suffice to insure that appellant was adequately represented by counsel and that appellant's "behavior in court might well increase the likelihood that he [would] be convicted." Because appellant had refused to discuss the circumstances of his arrest, Dr. Kapit was unable to opine on whether the crime had been a product of appellant's mental disease.

Dr. Kapit also wrote that still another physician, Dr. Bruce M. Cambosos, had examined appellant on October 18, 1982 and concluded that appellant appeared to be

suffering from paranoid schizophrenia. Dr. Kapit further wrote that on December 6, 1982, Dr. Cambosos had described appellant "as 'basically the same.... His thinking is most disorganized when he focuses on the case.'"

At a competency hearing on January 11, 1983, at which appellant represented himself with the assistance of his attorney-advisor, the government attempted to prove appellant incompetent with the testimony of two psychiatrists, Drs. Cambosos and Kapit. Appellant presented the testimony of two mental health technicians.

Dr. Cambosos, appellant's treating physician, testified that his original examination of appellant, on October 7, 1982, had revealed possible paranoid delusion. He added that he tentatively had diagnosed appellant as possibly suffering from paranoid schizophrenia. To establish his diagnosis, Dr. Cambosos had wanted appellant to submit to psychological tests. Appellant had refused, in part because he erroneously believed the doctor would ask questions about productivity and in part because appellant did not believe he had a mental problem.

Dr. Cambosos believed that appellant's condition had "improved slowly over the course of time" but that his condition fluctuated. The doctor could not state with any degree of certainty that appellant still suffered from paranoid schizophrenia; he was not absolutely sure appellant ever had. Dr. Cambosos thought appellant was cooperative, articulate, more intelligent than his ninth-grade education would lead one to believe, precise but lost in details, and sociable, although a loner.

Dr. Cambosos also believed appellant could cooperate with his attorney-advisor "if his advisor agrees with his contention that he is competent and that he does not suffer from a mental illness." The doctor was "much less certain that [appellant] would cooperate with his advisor, if his advisor let be known his feelings that [appellant] was incompetent." Dr. Cambosos was undecided as to whether appellant was competent to stand trial.

Dr. Kapit then testified, recommending as he had in his report that the court find appellant incompetent. He had considered three factors: (1) whether appellant "possessed a rational, intellectual understanding of his legal situation and the charges and the legal proceedings he [was] facing"; (2) whether appellant "could communicate sufficiently well with counsel, so that he would be adequately represented in a courtroom trial situation"; and (3) whether appellant "could behave in a courtroom in such a way that he could not do himself harm, or perhaps disrupt the courtroom proceedings and make a fair trial impossible." Dr. Kapit opined that, while appellant had a rational understanding of his legal situation and had the ability to express himself logically (at least at times), appellant would have difficulty consulting with counsel, especially if counsel suggested something contrary to appellant's notions. Moreover, there was a "substantial risk" that appellant "might not be able to behave appropriately" in court.

Upon the court's questioning, however, Dr. Kapit did draw a distinction between appellant's competency to represent himself and his competency to stand trial. When the court noted that the competency hearing had taken the middle ground, with appellant representing himself with advisory counsel, Dr. Kapit admitted he was impressed with the course of the hearing but stated he could not draw a conclusion, without further examination, as to whether appellant was competent to represent himself with advisory counsel.

Dr. Kapit reiterated his opinion that appellant probably suffered from paranoid schizophrenia. He noted that appellant's "long-term" condition waxed and waned and was susceptible to treatment through medication. Dr. Kapit further testified that appellant had steadfastly refused to answer productivity questions.

For appellant, two medical technicians testified that, in observing appellant at the Ugast Center, they had not noticed any bizarre or disruptive behavior.

At the conclusion of the hearing, the court deferred its decision and indicated it

wanted counsel to discuss with appellant whether he would be willing to take psychological tests, whether he would be willing to take prescribed medication, and whether he would relinquish his representation to appointed counsel. The court stated that it had greater concerns about appellant's ability to represent himself than it did about whether he was competent to stand trial.

Finally, the court noted that it also had ordered a productivity examination but that no one had addressed productivity. The prosecutor explained that there had been no productivity evaluation because appellant had refused to submit to psychological tests and had refused to answer productivity questions. The prosecutor added that the primary reason for no productivity examination, however, was that as long as the psychiatrists believed appellant was incompetent to stand trial, productivity was not particularly pertinent. The court agreed that productivity was "somewhat academic" until it resolved the competency question and noted that competency was a continuing question for the court.

At the next hearing on January 20, 1983, appellant announced he was willing to accept representation by counsel. He and his counsel also told the court that appellant did not want to take psychological tests or medication. Counsel assured the court that appellant was cooperating sufficiently to enable counsel to prepare for trial and to provide adequate representation. Based on these representations and on the testimony at the January 11 hearing, the court found appellant competent to stand trial. No one had addressed the productivity question; the court's two orders to conduct a productivity examination had gone unfulfilled.

At a status hearing on February 15, 1983, appellant's counsel held open until March 7 the possibility of announcing an insanity defense, although he conceded that such a defense was unlikely. Appellant's counsel thereafter filed motions to suppress eyewitness identification and to dismiss for want of a speedy trial. Appellant continued his illustrated correspondence to the court with an increasing number of biblical references, including appellant's handwritten colloquy among "Steny H. Hoyer," "Satan," and "God and Christ." Appellant did not raise an insanity defense at trial.

## B. *Voir Dire*

Before *voir dire*, the court explained its procedure. After the prospective jurors were brought in, but before they were sworn, the government served enhancement papers revealing appellant's prior conviction for armed robbery. At that point, counsel communicated appellant's insistence that the only relevant defense question for prospective jurors was "whether they believed Christ ascended in the spirit or in the flesh." Appellant himself explained: "That is the only question the defense will ask, that is the only question. That will alleviate a lot of conversation and unnecessary questions being asked since it is my body being tried today." The court denied the request for that question.

The prospective jurors were sworn. The court explained the case, introduced appellant, his counsel, the prosecutor, and several witnesses. One juror responded that he thought he knew appellant. At a bench conference, which appellant did not attend, the juror asked if a certain individual were appellant's brother. At the court's suggestion, counsel left the conference to confer with appellant. Counsel returned and reported that appellant had responded affirmatively. The juror was excused. A second juror responded that she knew a witness. After a bench conference, which appellant did not attend, she was seated.

At this second *voir dire* bench conference, after the juror had been seated, appellant's counsel stated that he had informed appellant he had a right to attend bench conferences during *voir dire* and that appellant had stated he would like to do so. The prosecutor objected, stating that appellant's presence "might unduly influence a prospective juror." The court denied the request but deferred explaining the ruling.

The prosecutor and counsel stayed at the bench while the court asked whether any member of the panel-or of his or her immediate family in the last ten years had been a witness to a crime, arrested for a crime, or the victim of a crime. *See United States v. Ridley*, 134 U.S. App.D.C. 79, 81, 412 F.2d 1126, 1128 (1969) (per curiam). Fifteen prospective jurors then individually approached the bench. Later, three other prospective jurors approached the bench, two because they knew or thought they knew the liquor store whose proprietors had been robbed and one because of medical problems. The prosecution and defense each used its ten strikes for regular jurors and its one strike for alternate jurors. Only one of the jurors who deliberated on the case had approached the bench during *voir dire.*

At the close of the first day of trial, the court explained its denial of appellant's request to attend bench conferences with prospective jurors. First, because *voir dire* and bench conferences had already begun, the court believed that appellant's sudden presence would be cumbersome and that jurors would wonder why he was there in their responses to the *Ridley* question, when he had not been there before. Second, because appellant was in custody, the marshal would also have to attend the conference and thus the conversation would become less private. Third, the trial court objected to our ruling in *Robinson v. United States*, 448 A.2d 853 (D.C.1982), giving defendants the right to be present at *voir dire* bench conferences. The court noted that we had denied a petition to hear the issue en banc by a four-four vote, *Robinson v. United States*, 456 A.2d 848 (D.C. 1983) (en banc) (per curiam), and asserted that we had not considered security and intimidation problems. Finally, the court considered the case file, including

the fact that for a long period of time [appellant] was found to be incompetent by psychiatrists. I cannot ignore the pleadings that you have generated in this case, and they are to say the least somewhat bizarre.

I also took into consideration about there having been outbursts in prior situations, and in the unique situation that your client [is] under ... [I] was concerned that there might be, without anybody to control it, some outburst at one of these bench conferences, or just some bizarre input from him that might be to everybody's prejudice.

## C. *The Trial*

Jack Jeweler testified that on July 23, 1981, at about 9:30 in the morning, he had left his car carrying $11,500 in a brown paper bag into his liquor store at 6111 Blair Road, N.W. Suddenly, a man in a grey jogging suit accosted Jeweler at gunpoint. The man forced Jeweler and his wife into the store, took the bag with the money, and fled on foot.

Meanwhile, an off-duty police officer, Reginald Williams, saw what was happening. He observed a darkly complected black man, later identified as appellant, approach in a grey jogging suit and rob, at gunpoint, the occupants of the vehicle across the street. He instructed the manager of a nearby lumber yard to call the police and then pursued appellant in his automobile. At one point in the chase, appellant turned to look at Williams, who got a brief but clear look at appellant's face. Williams, however, did not apprehend appellant.

Officer David Walters, who had received a radio run about the armed robbery, spotted appellant and pursued him on foot between two houses and over a fence, where he saw appellant drop the brown paper bag and a pistol. Appellant was apprehended. A few minutes later, Officer Williams saw appellant in police custody at the scene of apprehension and recognized him as the robber.

Because the robber had had something over his face when he confronted his victims, neither victim was able to identify him. Jeweler, however, did identify his money, his keys, and appellant's pistol after they were recovered by the police.

Appellant did not put on a defense. When appellant's counsel called him to testify, appellant refused to swear or affirm he would tell the truth, saying in front of

the jury: "I can't swear and I cannot confirm and Jesus Christ died for these sins that I may have committed.... Under the law of God no man is justified under the law doing anything and therefore there be no need to take the stand." The court excused the jury. In the colloquy that followed, appellant said: "I told my attorney he could call me and we would see what we could see.... [But] I cannot testify to anything, Your Honor. What can I testify to?"

The court recalled the jury. Appellant did not testify. After hearing closing arguments of counsel and the court's instructions, the jury deliberated and returned guilty verdicts on both charges.

## II. Voir Dire

Appellant argues that the trial court abridged his right to be present at *voir dire* bench conferences with prospective jurors. A year before appellant's trial, we announced in *Robinson v. United States*, 448 A.2d 853 (D.C.1982), that because criminal defendants have the right to be present at all stages of a trial, they have the right to be present at *voir dire* conducted at the bench. *Accord, Gary v. United States*, 499 A.2d 815, 835 (D.C. 1985) (en banc), *cert. denied*, — U.S. —, 106 S.Ct. 1470, 89 L.Ed.2d 725 & — U.S. —, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986); *Boone v. United States*, 483 A.2d 1135 (D.C.1984) (en banc); *Young v. United States*, 478 A.2d 287, 289–91 (D.C.1984); *Welch v. United States*, 466 A.2d 829, 838–39 (D.C.1983); *see also United States v. Washington*, 227 U.S.App.D.C. 184, 191–93, 705 F.2d 489, 496–98 (1983) (per curiam), *cited with approval in Boone*, 483 A.2d at 1141–42.

■ The defendant's right to be present at trial, however, is not unlimited. *Illinois v. Allen*, 397 U.S. 337, 343–44, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970) (disruptive defendant, after warning, may be bound and gagged, cited for contempt, or removed from courtroom until promising to behave). Similarly, the right to be present at bench *voir dire* is not unlimited, *Boone*, 483 A.2d at 1137 (recognizing possibility

that some "factual or legal considerations ... might place the case beyond the rationale or holding of *Robinson*"). In each case, the trial court must weigh "the comfort and security of persons who perform a public service" and the efficient administration of justice against "the principle that the presence of the defendant is essential to the legitimacy of our criminal justice system." *Boone*, 483 A.2d at 1141 (citation omitted).

■ "In normal cases" the balance dictates that "the defendant upon request should be allowed to observe and hear juror responses made at the bench." *Washington*, 227 U.S.App.D.C. at 192, 705 F.2d at 497. If complications arise, however—for example, when a security problem is present—the defendant's right to observe and hear juror responses can be protected through procedures other than the defendant's physical presence next to the prospective juror at the bench. *Id.* at 192 & n. 4, 705 F.2d at 497 & n. 4. *Washington* suggested, for example, conducting *voire dire* in such complicated situations over closed circuit television, *id.*, so that the defendant could observe the proceedings without intimidating the juror. Alternatively, and probably more practically, the court could conduct individual *voir dire* in open court, excluding all other members of the jury panel and keeping the defendant a safe distance away at counsel table. *Boone*, 483 A.2d at 1142. In any event, "the method and manner of conducting a *voir dire* are left to the discretion of the trial judge," *United States v. Bryant*, 153 U.S.App.D.C. 72, 76, 471 F.2d 1040, 1044 (1972), *cert. denied*, 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973), including the "discretion to limit voir dire to protect juror safety...." *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 514 n. 1, 104 S.Ct. 819, 826 n. 1, 78 L.Ed.2d 629 (1984) (Blackmun, J., concurring).

■ At trial, this case presented a complicated situation, as the court recognized. Appellant was in custody as a previously convicted armed robber who had escaped from police custody in this case and had a history of mental illness. The strong evi-

dence of appellant's mental illness gave rise to a reasonable concern that appellant would act out and intimidate jurors, threaten their safety, or cause them to be prejudiced against him. Several psychiatrists had examined appellant and testified that he was mentally ill and incompetent. Dr. Kapit had explicitly warned in writing that appellant's "behavior in court might well increase the likelihood that he [would] be convicted" and later had testified that there was a "substantial risk" that appellant "might not be able to behave appropriately" in court. Just moments before appellant's request to attend the bench conferences, moreover, he had insisted that the only important question to ask prospective jurors was "whether they believe[d] Christ ascended in the spirit or in the flesh." Accordingly, the trial court had every reason to conclude that, if appellant were to be present at *voir dire* bench conferences, alternative arrangements would have had to be made.

If appellant had made a timely request to assert his right to hear and observe jurors' responses at bench *voir dire,* the court would have had to arrange special procedures to accommodate him. But appellant did not timely assert his right. His request came after the prospective jurors had been sworn, *voir dire* had begun, and two prospective jurors had approached the bench without appellant's being present. To accommodate appellant's late request the trial court would have had to interrupt the proceedings, perhaps for a considerable time, to make special arrangements to satisfy both appellant's rights and the need for juror protection. Such arrangements could not be designed and instituted immediately, given the physical limitations of court room facilities. Even the alternative of conducting *voir dire* in open court, with appellant remaining at counsel table, posed logistical problems, since the trial court could not simply clear the courtroom of other members of the jury panel without having made arrangements for their convenient location and orderly recall. In short, "[i]t does not seem ... to be consonant with the dictates of common sense that an accused person ... should be at liberty whenever he [or she] pleased, ... to break up a trial already commenced." *Falk v. United States,* 15 App.D.C. 446, 454 (1899), *cert. denied,* 181 U.S. 618, 21 S.Ct. 923, 45 L.Ed. 1030 (1901).

We recognize that the defendants in *Gary, Robinson,* and *Washington* made their requests to be present at *voir dire* bench conferences after *voir dire* had begun and that their requests were not held untimely. There is no indication, however, that the defendants in those cases presented any unusual security problem requiring special arrangements.

Appellant's counsel was on notice from the prolonged competency proceedings, if nothing else, that appellant's mental instability would present problems in accommodating his request to be present at bench *voir dire.* Counsel should have known that special arrangements would have to be made; he therefore had a duty to notify the court, before the jury panel was called in, that appellant would, or at least might, assert this right. In view of the interruptive and special precautions that would have been required, we perceive no error in the trial court's denial of appellant's untimely request to be present at *voir dire* bench conferences.

### III. Recross-Examination

■ Appellant also argues that the trial court abused its discretion in prohibiting recross-examination of Officer Williams. On direct examination, Williams testified that he had observed the robbery suspect's facial features when he drove alongside the suspect in the chase. On cross-examination, defense counsel impeached this testimony by reference to the officer's failure to mention, in either the report he had written shortly after the arrest or in his grand jury testimony, that he had seen the suspect's face. On re-direct, the officer accounted for this omission by explaining that "no one ever asked about it." The trial court denied appellant's request to recross-examine the officer because the court found no new matter had been raised by redirect examination.

Appellant contends that the testimony on redirect examination did raise a new matter: the reason for the omission. He argues that if the court had allowed him to recross-examine, he would have questioned the officer as to why the same police training that had taught him to form mental pictures of a suspect's facial features had not also taught him to report those facial features without being asked.

Appellant essentially claims that an explanation of an old matter is a new matter. He is incorrect. Appellant already had had a full opportunity to cross-examine Williams about his prior statements. We perceive no abuse of discretion. *Hilton v. United States*, 435 A.2d 383, 389 (D.C. 1981); *Singletary v. United States*, 383 A.2d 1064, 1073–76 (D.C.1978).

## IV. FAILURE TO CONDUCT A FRENDAK INQUIRY

Appellant contends the trial court erred in failing, *sua sponte*, to conduct an inquiry into whether he had voluntarily and intelligently waived an insanity defense, as required by *Frendak v. United States*, 408 A.2d 364 (D.C.1979).

### A.

In *Frendak*, the jury convicted the defendant of first degree murder and carrying a pistol without a license. Troubled by evidence at the competency hearings and at trial, the trial court *sua sponte* conducted an inquiry into the defendant's sanity at the time of the crime, eventually interposing, over defendant's objection, an insanity defense at a second, insanity phase of the trial—without conducting an inquiry into whether the objecting defendant had voluntarily and intelligently waived the defense. We remanded for such a determination, ruling that the trial court has discretion to interpose an insanity defense over a defendant's objection only if the court is convinced, after proper inquiry, that the defendant has not made, and cannot make, such a voluntary and intelligent decision. *Frendak*, 408 A.2d at 380–81.

In reaching that conclusion in *Frendak*, we distinguished among three separate determinations (addressed to three different mental capacities) which the trial court must make, in the following sequence, when the defendant's mental conditions at the times of the trial and the crime, respectively, are at issue:

> (1) whether the defendant is presently competent to stand trial; (2) if so, whether he or she, based on present mental capacity, can intelligently and voluntarily waive the insanity defense and has done so; (3) if not, whether the court *sua sponte* should impose the insanity defense based on evidence of the defendant's mental condition at the time of the alleged crime.

*Anderson v. Sorrell*, 481 A.2d 766, 769 (D.C.1984) (summarizing *Frendak*). As to the second, now commonly called a "*Frendak* inquiry*," we held, more specifically, that

> whenever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense.

*Frendak*, 408 A.2d at 380.

A few years later in *Anderson*, we held on fifth amendment grounds that, upon defense objection, the court could not order a pretrial productivity examination, *i.e.*, a psychiatric examination into the defendant's sanity at the time he or she allegedly committed the offense, before it conducted a *Frendak* inquiry. *Anderson*, 481 A.2d at 767.

In both *Frendak* and *Anderson*, the defendant's possible insanity at the time of the crime was clear; in both cases, in connection with competency proceedings, the court had received psychiatric evidence suggesting productivity. *Anderson*, 481 A.2d at 767; *Frendak*, 408 A.2d at 368–69. Those cases, accordingly, concerned the court's responsibility to conduct a *Frendak* inquiry when the court reasonably would have to conclude, from expert evidence of

record, that an insanity defense was a real possibility.

■■■ The instant case presents a new question: when competency proceedings raise serious questions about competency to stand trial but do not include expert opinion on productivity, and the defendant states he or she will not plead insanity and refuses to cooperate with a productivity examination, is there enough record evidence of insanity at the time of the crime to trigger a trial court responsibility to initiate a *Frendak* inquiry? The concern is this: although *Frendak* precludes the trial court from interposing an insanity defense when a defendant has the capacity to waive it and does so, *Frendak* also reaffirms the trial court's responsibility, in the exercise of sound discretion, 408 A.2d at 380–81 & n. 30, to interpose such a defense "whenever the evidence suggests a substantial question of the defendant's sanity at the time of the crime," *id.* at 380, and the defendant not only fails to assert the defense but also is incapable of making a voluntary and intelligent decision to waive it. Accordingly, *Frendak* suggests that, if a defendant eschews a substantial insanity defense but lacks the capacity to waive it, the trial court, in fairness to the accused, should be alert to its responsibility to interpose the defense rather than permit the defendant to accomplish waiver, in effect, through inaction or obstreperous behavior that blocks the court's inquiry. This means that the trial court must be particularly sensitive to evidence of insanity at the time of the crime which the defendant may be trying to withhold.

### B.

At the status hearing on November 30, 1982, the court noted that a previous judge had ordered both competency and productivity examinations and that the court saw nothing in any of the psychiatric reports "that even deals with productivity." The court then explained to appellant what productivity means. Appellant replied:

> It would be a good thing if I was going to make an insanity offense [sic], where I could say, at the time the crime occurred I was insane.
>
> This also could be an entrapment, too, you know, because the information that I give the doctor can be brought forth in the court at whatever date that I have a trial, and it's at the disposal of the District Attorney, and can be used at a given time. So to talk freely about a particular charge that I am supposed to be charged with, I personally do not think that I should talk with the doctor pertaining to this, *because I am not trying to plead any insanity defense, you know.* [Emphasis added.]

Essentially, therefore, appellant was taking the same position the defendant asserted before trial in *Anderson.*

The court then ordered a hearing on appellant's competency to stand trial, as well as a report on productivity:

> [A]t the same time we will ask the doctor to tell us whether he has reached a conclusion on the productivity question. And if the only answer we get is that Mr. Briggs was—wouldn't speak to me about it and, therefore, I couldn't reach a conclusion, that is fine, too. But at least you will have dealt with that part of the request.

Thus, the court twice ordered productivity examinations. As it turned out, however, none was ever conducted.

■■■ Precisely framed, therefore, the question is whether the following record evidence should have put the court on notice that a *Frendak* inquiry was required: (1) appellant's flood of bizarre letters and *pro se* pleadings to the court, including requests for self-representation, beginning the day after the indictment (approximately six months after appellant's apprehension and detention and a year after the crime); (2) psychiatric evaluations by Drs. Donohue, Kapit, and Cambosos calling appellant a paranoid schizophrenic (a "long term" condition that fluctuated) and questioning his competency to stand trial; (3) appellant's refusal to cooperate with courtordered examinations into productivity, coupled with his expressed desire to waive an insanity defense and his attorney-advisor's

representation that an insanity defense was possible but unlikely.

We conclude that a *Frendak* inquiry was required. There undoubtedly will be circumstances where a legitimate question of competency to stand trial does not imply possible productivity triggering the need for such an inquiry. *See Wilson v. United States*, 403 A.2d 333, 335–37 (D.C.1979) (trial court, after ruling defendant competent to stand trial, did not err in declining to hold hearing on whether to impose insanity defense when, *inter alia*, court had received two medical reports concluding defendant was not suffering from mental disease at time of offense); *cf. Clyburn v. United States*, 381 A.2d 260, 262–64 (D.C. 1977) (trial court did not abuse discretion in declining to raise, *sua sponte*, question of defendant's competence to stand trial and sanity at time of offense when factors cited by defendant at most "profile[d] a troubled man"), *cert. denied*, 435 U.S. 999, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). Under the circumstances here, however, where the trial court itself expressed concerns about productivity based on bizarre pretrial behavior, where competency examinations indicated classic, long-term mental illness, and where appellant has resisted every inquiry into a possible insanity defense, we conclude the trial court abused its discretion in dropping the productivity issue without making a *Frendak* inquiry and taking whatever steps became necessary as a consequence.

More specifically, in the first place, while the trial court's own perceptions of appellant's mental condition are not determinative of the legal issue on appeal, they are relevant nonetheless. Two motions judges ordered productivity examinations. Both orders were issued after the court had reviewed appellant's bizarre behavior beginning the day after his indictment and had learned from competency examinations that appellant was probably a paranoid schizophrenic. Moreover, the second order occurred after appellant had expressly stated he would frustrate any effort for a productivity examination and did not intend to assert an insanity defense. At least the second judge erred, therefore, by issuing the wrong kind of order; a pretrial productivity examination may not be ordered, over defense objection, before a *Frendak* inquiry. *Anderson*, 481 A.2d at 769.[1] If the judge had applied the law correctly to her own perceptions of the record, *i.e.*, that appellant may have been insane at the time of the offense, she would have initiated a *Frendak* inquiry. Therefore, we see no room for the government's argument on appeal that, absent record evidence of productivity (presumably based on expert opinion), a *Frendak* inquiry was not indicated. The trial court's own perceived need for a productivity examination, despite appellant's insistence on foregoing an insanity defense suggests, implicitly at least, that the court believed further inquiry into a possible insanity defense was necessary.

▇ Second, of central significance, appellant's apparent illness, paranoid schizophrenia, was a long-term condition, according to Dr. Kapit, and one that fluctuated, according to Dr. Cambosos; thus, the trial court should have been expected to ascertain, more precisely, whether such a classic illness could have arisen for the first time after appellant had been arrested, jailed, and indicted, or could have been a basis for productivity at the time of the crime months earlier. Because of the long-term, fluctuating nature of appellant's apparent illness, therefore, we cannot agree with the government that the absence of record evidence of bizarre behavior until the day after the indictment—a year after the crime and six months after apprehension and detention—is enough to eliminate trial court responsibility for a *Frendak* inquiry.

Third, the only significant difference between the record in this case and those in *Frendak* and *Anderson* is the inability of the psychiatrists to address productivity in this case because of appellant's unwillingness to cooperate. Anderson, too, had resisted a productivity examination, but the examinations into his competency none-

---

1. We note that we had not yet issued our opinion in *Anderson* at the time the motions judge issued the order for a productivity examination over defense objection.

theless yielded expressions of concern by the psychiatrists that there may have been productivity. *Anderson*, 481 A.2d at 767. Whether this is merely a fortuitous difference between the cases or reflects a difference between expert evaluations of appellant and Anderson cannot be determined. In any event, we are unwilling to distinguish this case from *Anderson* and *Frendak* simply on the ground that competency examinations in these other cases happened to yield expert expressions of concern about productivity which an evaluation of competency is not even intended—or permitted—to consider. In the present case, three factors—appellant's bizarre pretrial behavior evoking genuine trial court concern about productivity, the expert testimonial evidence of appellant's long-term mental illness giving substance to that concern, and appellant's resistance to an insanity defense barring an immediate inquiry into productivity—are enough, taken together, to trigger a *Frendak* inquiry. Appellant's behavior and "long term" diagnosis are the equivalent—absent further trial court inquiry yielding a contrary indication—of the psychiatrists' expression of concern about productivity in *Anderson*.

The case may arise where a recalcitrant defendant declines to cooperate with even a *Frendak* inquiry, as well as with a productivity inquiry. That case may squarely present the question of trial court responsibility when the possibility of an insanity defense is evident but there is no practical way to determine whether the defendant is capable of waiving it, let alone to determine whether the defense is substantial enough to be concerned about. But we do not confront that question here. Appellant cooperated with all competency examinations. Because a *Frendak* inquiry does not necessarily have to explore productivity, *see Anderson*, 481 A.2d at 770, we cannot say that appellant would have resisted such an inquiry.

Accordingly, we must remand for a *Frendak* inquiry. The trial court shall have the latitude described in *Anderson*, 481 A.2d at 769–71, including the discretion to order psychiatric evaluations which address details of the crime if necessary to resolve appellant's capacity for waiver.

(1) If, as a result of the *Frendak* inquiry, the court concludes that appellant made a voluntary and intelligent decision at the time of trial to waive an insanity defense, that will end the matter; the convictions shall stand. *See Frendak*, 408 A.2d at 380–81.

(2) If, however, the court concludes that appellant did not make such a waiver, then the court—

(a) shall determine whether appellant presently wishes to waive the insanity defense;

(b) if he does not,[2] or if he is presently incapable of making a voluntary and intelligent decision whether to do so, the court shall order a productivity examination, assuring appellant that his disclosures in that context cannot be used against him, *Anderson*, 481 A.2d at 769 (citing *White v. United States*, 451 A.2d 848, 851 (D.C. 1982)), and that the psychiatric report(s) will be communicated initially to the court *in camera, id.* at 770–71. Such an examination is necessary because the trial court must have an evidentiary basis to determine whether there is sufficient evidence for an insanity defense. *See Cooper v. United States*, 368 A.2d 554, 559–60 (D.C. 1977) (defendant must establish prima facie case of insanity before trial court has to submit that issue to jury).

(3) If the court orders a productivity examination, appellant cooperates, and the court concludes, as a result, that appellant's actions at the time of the crime may have been the product of insanity, the court shall have discretion under the guidelines of *Frendak*, 408 A.2d at 380–81, to order a new insanity phase of the trial.

---

**2.** Presumably, by taking this appeal, appellant signals a desire no longer to waive the insanity defense; however, the trial court must make a proper finding. If appellant were to decide, on remand, that he did not wish to raise an insani-

ty defense after all—and if the trial court found him competent, under *Frendak*, to make that decision—then of course his convictions should stand.

(4) If, however, appellant cooperates with a productivity examination and the court concludes, after an appropriate review, that there is insufficient evidence to raise a fact issue of productivity, the convictions shall stand. *Compare Pegues v. United States,* 415 A.2d 1374, 1377–78 (D.C.1980) (because defendant's proffer of two psychiatric reports and his own testimony "lacked a critical element of the defense—a causal relationship between the criminal conduct and his mental disease," trial court did not abuse its discretion in declining to allow defendant to present this evidence to jury), *with Cooper,* 368 A.2d at 560–61 (trial court erred in not submitting insanity defense to jury when defendant presented evidence that consumption of large quantity of alcohol, plus a blow to the head, caused "blackout" during period when homicide occurred and defendant could not distinguish right from wrong).

(5) Finally, if a productivity examination is ordered but does not yield useful results because appellant fails to cooperate (despite the implication of this appeal that he will do so), the trial court will have to deal with such evidence of productivity as otherwise exists.

*So ordered.*

PRYOR, Chief Judge:

Applying the standards enunciated in *Frendak v. United States,* 408 A.2d 364 (D.C.1979), I agree that, under the particular facts of record in this case, one of those rare circumstances arose where the trial court, in the exercise of discretion, was required to conduct a hearing to determine whether a substantial insanity defense had been intelligently waived. Accordingly, I vote to remand the case to resolve that narrow question.

* Chief Judge PRYOR and Associate Judges BELSON and STEADMAN have recused from