Clinton O. HOLMES, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CM–671.

District of Columbia Court of Appeals.

Submitted Sept. 16, 1992.
Decided Oct. 16, 1992.

---

Mack E. Davis, appointed by this court, was on the brief for appellant.

Jay B. Stephens, U.S. Atty. and John R. Fisher, Thomas C. Black, and Eric L. Yaffe, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FARRELL, Associate Judge, and GALLAGHER, Senior Judge.

ROGERS, Chief Judge:

On appeal from his conviction at a bench trial of simple assault, D.C.Code § 22–504 (1989 Repl.), appellant Clinton Holmes contends that his due process rights were violated when the trial judge questioned him after the defense and prosecution had rested and failed, *sua sponte*, to grant a judgment of acquittal. He also contends that the trial judge abused his discretion by not conducting a *Frendak*[1] inquiry. We remand the case to the trial court to conduct a *Frendak* inquiry because the evidence demonstrates a "sufficient question" regarding appellant's sanity on the date of the assault, but otherwise we affirm.

I

On the afternoon of November 26, 1990, Ms. Evan Anderson, an assistant teacher at Raymond Elementary School, saw appellant grab two schoolchildren by their arms. Appellant was wearing a beige jacket, a beige dress, jeans, tennis shoes, a hat and a wig. Ms. Anderson ran up to appellant, told him to "get his darn hands off them," and escorted the children away. She then called the police.

Shortly thereafter, Gorge Garland Hill observed appellant chase after and grab

---

**1.** *Frendak v. United States,* 408 A.2d 364 (D.C.   1979).

another elementary school student named Ebony Mallory. Mr. Hill testified that appellant, who "wasn't dressed like a normal person," was "manhandling," grabbing and holding the child as she struggled to get away, screaming and hollering. Mr. Hill ran after appellant and held him until the police arrived.

According to Ms. Mallory, appellant initially approached her and asked her where she lived, to which she replied "I don't know." She became frightened and began to cry. Appellant then grabbed her from the back with both hands. When she attempted to run away, appellant grabbed her again. She described appellant's appearance as dirty and wearing a long white robe and a scarf.

Appellant admitted approaching Ms. Mallory on November 26, 1990, because "she was in the street and she was just a little toddler and I had to say something to her." The child was crying from the minute appellant saw her, and she had told him that she was lost. He asked the child where she lived, but she was unable to tell him. So he called to a man standing near a car and that man took the child. After first denying that he touched the child, appellant explained that "If I touched her at all, I touched her very gently." Upon being arrested, appellant told the police that he was sick and unable to speak to them, and he was taken to a hospital for a few hours before being taken to the police precinct.

Appellant further testified that on the day of the incident he suffered from a sickness, which he described as a "paralysis stricken through [his] body." He stated that before testifying he had taken Haldol for his nerves and Cogentin to relieve pres-

sure on his jaw. He claimed that he had first started taking Haldol over five years prior to trial. In response to the trial judge's questions, appellant stated that he suffered from schizophrenia and that he was "a person that's hyper, slightly paranoid or things like that." [2]

The trial judge questioned appellant further about the incident, and when he dismissed appellant from the witness stand both the government and the defense rested. Following a recess the judge stated that "the case raised some questions in my mind about a defense of the case and it's still there. And I would like to ask just a few more questions of the defendant regarding the day in question." Both counsel stated that they had no objections to such questioning. The following colloquy took place between the trial judge and appellant:

[Court]: Mr. Holmes, ... I want to understand better how you were feeling that day.

I want to ask you what you are doing for the two or three hours before the time on that day that you met the eight-year-old girl, Ebony Mallory.

Were you walking around or what were you doing?

[Appellant]: Walking around.

[Court]: Walking around?·

[Appellant]: Yes, sir.

[The Court]: How would you describe how you were feeling?

[Appellant]: I guess just contortion in my limbs. Sometimes I go to the hospital. I'm not always accepted at VA Hospital. So there's a lacking in awareness of my going to the hospital. I have to take my time if I'm sick.

---

2. After both sides had presented evidence, the trial judge asked appellant the following questions:

COURT: You speak about [sic] you were sick that day.
[APPELLANT]: Yes, sir.
COURT: What was your sickness?
[APPELLANT]: Well, it's called schizophrenia and I'm just a person that's hyper, slightly paranoid or things like that.
       *    *    *    *    *
THE COURT: Did you take Haldol or Cogentin on the day of this incident?

[APPELLANT]: No, I didn't.
THE COURT: How do you know that?
[APPELLANT]: Because I went to the hospital and I said they didn't give me any medicine. I stayed there for a few hours. You can call the doctor today.
       *    *    *    *    *    *
THE COURT: Why were you sick on that day?
[APPELLANT]: My symptoms had just flared up.

[The Court]: Well, when you were walking around, were you able to pay attention to traffic lights and—

[Appellant]: Yes.

\*    \*    \*    \*    \*    \*

[The Court]: And you were aware of what's prohibited or permitted of pedestrians like yourself, is that right, on the day in question?

[Appellant]: Yes.

[The Court]: And you talked about seeing those gentlemen working on a car at around the time you met Ebony Mallory.

You indicated one of those men was intoxicated; is that right?

[Appellant]: That's correct Your Honor.

[The Court]: Were you aware on the day in question that if the intoxicated man said anything to you that you didn't like how it sounded, would it be—did you recognize [it] would be wrong to haul off and hit him?

[Appellant]: Yes, I would, especially in the child's presence.

[The Court]: On the day in question, would you have recognized that it would have been wrong, for example, to throw a rock at any of the cars that drove by while you were taking your walk?

[Appellant]: Yes.

\*    \*    \*    \*    \*    \*

The judge thereafter heard closing arguments, and he found appellant guilty of assault of Ms. Mallory.[3]

3. The judge suspended imposition of 240 days imprisonment as to time served and placed him on 18 months supervised probation (including "counseling and psychological or psychiatric treatment").

4. While appellant's decision not to object to further questioning by the judge would not constitute a waiver of the manner in which questions were asked or a waiver of the trial judge's continued impartiality during such questioning, appellant only claims the trial judge's decision to conduct any inquiry at all after the close of evidence was erroneous. Furthermore, we reject appellant's contention that defense counsel had not been "adequately informed by the [trial judge] as to the purpose of [his] proposed reexamination" when counsel waived objection to further questioning. The trial judge said he wanted to ask additional questions because he had "questions in [his] mind about a defense."

## II

Appellant's contention that the trial judge's questioning, after the defense and prosecution had rested, violated his right to due process is unpersuasive. The record demonstrates not only that neither side had rested when the judge questioned appellant, but that before doing so the trial judge asked defense counsel whether she objected to further questioning of appellant by the judge, and defense counsel stated that he did not. Because "[p]arties may not assert one theory at trial and another theory on appeal," appellant's objection to the trial judge's questioning on appeal is barred. *Byrd v. United States*, 502 A.2d 451, 453 (D.C.1985). Furthermore, the judge's questioning with regard to appellant's mental state on the day of the assault was appropriate in view of the judge's obligations under *Frendak, supra* note [1], 408 A.2d at 364. *See* Part IV, *infra*. Thus we find no abuse of discretion, much less plain error. *McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991) (quoting *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976)).[4]

We also find no error in the trial judge's failure to raise, *sua sponte*, and grant a judgment of acquittal for appellant.[5] The record clearly demonstrates that appellant's conviction was based on sufficient evidence. Contrary to appel-

Under the circumstances, defense counsel could have anticipated that the trial judge might inquire about appellant's mental condition at the time of the assault. But if counsel was unclear about the intended scope of the trial judge's questioning, counsel should have inquired. Instead counsel unequivocally stated that she had no objection to further inquiry by the trial judge. Defense counsel also did not object during the trial judge's questioning and she stated at the conclusion of the inquiry that she had no questions in light of the trial judge's questioning.

5. That appellant did not renew his motion for judgment of acquittal (on the grounds the government failed to prove intent) at the close of all the evidence does not foreclose his argument on appeal that the evidence was insufficient to sustain a conviction. *In re J.N.H.*, 293 A.2d 878, 880 (D.C.1972).

lant's contention, our review of a motion for judgment of acquittal is based on a sufficiency of the evidence standard. *See Curry v. United States*, 520 A.2d 255, 263 (D.C.1987) (whether "a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime" (emphasis in original) (citation omitted)); *Ray v. United States*, 575 A.2d 1196, 1198 (D.C.1990) (assault consists of (1) an attempt or threat by defendant to injure victim, (2) defendant's apparent ability to injure victim and (3) defendant's intent to do act constituting assault); SU-PER.CT.CRIM.R. 29. In view of the evidence that appellant repeatedly grabbed Ms. Mallory and other children in a menacing manner, a reasonable decision-maker could find appellant guilty of assault. *See Curry, supra,* 520 A.2d at 263.

Appellant also contends, however, that the trial judge abused his discretion by failing to conduct a *Frendak*-type inquiry on whether to interpose an insanity defense on appellant's behalf. Under the circumstances, we agree.

### III

■ Reaffirming the precedent established by *Whalem v. United States*, 120 U.S.App.D.C. 331, 346 F.2d 812 (en banc), *cert. denied,* 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965), the *Frendak* court recognized a trial judge's "duty to confront the insanity issue if the evidence adduced in the proceedings raises a 'sufficient question as to a defendant's mental responsibility at the time of the crime.'" *Frendak, supra* note [1], 408 A.2d at 379 (quoting *Whalem, supra,* 120 U.S.App.D.C. at 337, 346 F.2d at 818); *see also Briggs v. United States,* 525 A.2d 583, 592 (D.C.1987). In an

important qualification of *Whalem,* however, the court in *Frendak* held that a trial judge must respect a defendant's decision to forego an insanity defense and let the jury's verdict stand without interposing one on defendant's behalf during a second insanity phase of trial "[i]f the [trial] judge finds that the defendant is capable of making an intelligent and voluntary decision." 408 A.2d at 380.[6] The trial judge, in applying *Frendak,* has to make a threshold determination on the issue of whether there is "a 'sufficient question' of insanity confront[ing] the court" such that a more formal inquiry is necessary. *Id.* at 381 n. 31. If there is a "sufficient question," the trial judge may decline to interpose an insanity defense only if, following the inquiry, the judge finds that "(1) the defendant is presently capable of intelligently and voluntarily waiving the defense, or (2) there is insufficient evidence of insanity at the time of the offense to warrant submitting that issue to the jury." *Id.*

■ Although the trial judge never conducted a *Frendak* inquiry in the instant case, the government maintains that the trial judge did not abuse his discretion because there was not a "sufficient question" of appellant's insanity on the day of the assault. However, the government overlooks evidence that was before the trial judge. Appellant testified that he suffered from schizophrenia and that on the day of the assault he had not taken medication, which was designed to control his condition.[7] Three eyewitnesses testified about appellant's unusual behavior and his bizarre clothing on the day of the assault. Further, the competency reports indicate that appellant may have had a basis for

6. The trial judge must conduct an inquiry to determine whether defendant's decision to forego an insanity defense is voluntary. *Frendak, supra,* 408 A.2d at 379. Moreover, a trial court's finding that defendant is competent to stand trial is an insufficient "indication that defendant is capable of intelligently waiving an insanity defense." *Id.*

7. Relying on *Carter v. United States,* 531 A.2d 956, 960 (D.C.1987) (voluntary intoxication no defense to general intent crime), the government argues that an insanity defense is not

available in the instant case because, just as one cannot use voluntary intoxication as a defense, one should not be able to assert an insanity defense where such insanity arose from one's voluntary failure to take required medication. It would be premature for this court to address this issue since the trial court never reached it. Moreover, the trial court never found that appellant's failure to take his medication was voluntary, and there is some evidence to the contrary.

interposing an insanity defense to the assault.

During the first attempted pretrial competency examination on November 28, 1990, two days after the offense, appellant refused to be interviewed. The following day, Dr. Bruce Cambosos, M.D., a staff psychiatrist for the Legal Services Division of the Forensic Services Administration, conducted a partial examination,[8] and he concluded in his letter to the trial court that appellant "[did] not appear to have an adequate understanding of his charges or of the judicial process.... [and did] not appear to be able to effectively participate in the judicial process at the present time." Dr. Cambosos opined that "[appellant] appears to be suffering from an active major mental illness which significantly impairs his mental function at the present time." [9]

About two weeks later, on December 14, 1990, Dr. Lawrence S. Oliver, Ph.D., a staff psychologist with the Legal Services Division of the Forensic Services Administration, conducted an updated mental competency examination. In his letter to the trial court he observed that "[appellant's] condition has improved markedly ... [since his] November 29, 1990, [examination]." Dr. Oliver stated that "the symptoms of [appellant's] chronic thought disorder are in remission at this time, and he is capable of participating in legal proceedings." He warned, however, that appellant "must continue to receive medications to maintain competency." Dr. Oliver noted appellant's "extensive mental health history," including a number of commitments to mental institutions, and that appellant "received 50% disability from the Veterans' Administration because of his schizophrenia condition."

Our decision in *Briggs, supra,* is instructive.[10] In that case the court concluded that a *Frendak* inquiry was required because of Briggs' bizarre pretrial behavior, the trial judge's expression of concern about productivity, Briggs' "competency examinations [which] indicated classic, long-term mental illness" called paranoid schizophrenia, and Briggs' resistance "to every inquiry into a possible insanity defense." [11] 525 A.2d at 593. In the instant case the evidence of the assault indicated unusual behavior by appellant.[12] Likewise, the trial judge was similarly concerned

---

**8.** In a letter to the trial court, Dr. Cambosos stated that appellant was unable to complete the interview and gave "no reason for this behavior."

**9.** In his November 29, 1990, letter Dr. Cambosos also stated:

> [Appellant is] very preoccupied and only marginally cooperative. His posture is slump, he is very subdued and withdrawn, and his responses are delayed and often not forthcoming. His affect is quite flat with occasional episodes of inappropriate laughter. His speech is decreased in production and it is vague. There is no evidence present of delusions, hallucinations, suicidal ideas, or homicidal thoughts. He is not correctly oriented as to place and time. His memory is questionably impaired. His ability to perform numerical calculations and abstracting tasks is impaired. His insight and judgment are impaired. [Appellant] has a history of schizophrenia. He has been hospitalized for this illness at Saint Elizabeths Hospital in the past but it appears that he has had no recent psychiatric treatment. He states that he experiences anxiety, depression, impaired memory, racing thoughts, and decreased appetite. He denies having euphoria, delusions, hallucinations, suicidal ideas, homicidal thoughts, or mood swings.

**10.** Whether a "sufficient question" of insanity is presented so as to require the *Frendak* inquiry remains a "question ... [to] be resolved on a case by case basis." *Whalem, supra,* 120 U.S.App.D.C. at 338 n. 10, 346 F.2d at 819 n. 10.

**11.** In *Briggs, supra,* the court identified the factors triggering a *Frendak* inquiry:

> appellant's bizarre pretrial behavior evoking genuine trial court concern about productivity, the expert testimonial evidence of appellant's long-term mental illness giving substance to that concern, and appellant's resistance to an insanity defense barring an immediate inquiry into productivity....

525 A.2d at 594.

**12.** Whereas Briggs wrote bizarre letters and *pro se* pleadings to the court including requests for self-representation, appellant, according to Dr. Oliver's letter to the court, engaged in "occasional episodes of inappropriate laughter," was disoriented as to place and time, and was unable "to perform numerical calculations and abstract tasks" during his November 29, 1990, competency examination. Three witnesses also testified concerning his strange attire on the day of the assault.

about appellant's productivity, asking appellant questions about his ability to distinguish right from wrong on the day of the assault. Appellant's competency examinations reveal that, like Briggs, he had a history of schizophrenia and had been completely uncooperative in the first effort to examine him for competency and only partially cooperative on the third day after the assault. Based on a partially completed examination, a psychiatrist stated that appellant appeared to be suffering from "an active major mental illness which significantly impairs his mental function." Although a psychologist concluded approximately two weeks later that appellant was competent to stand trial, he specifically observed that appellant's condition had improved considerably since his prior mental competency examination, referred to the medication that appellant had been receiving, and warned that appellant would only remain competent to stand trial if he continued taking his medication. Thus, the competency reports support the theory that appellant may have suffered from a mental illness causing the assault and only gradually recovered after receiving necessary medication. Additionally, neither appellant nor Briggs underwent a productivity examination and the trial court in neither case received any psychiatric evaluation relating to productivity in the competency reports.[13] *Compare Briggs, supra,* 525 A.2d at 591 *with Robinson v. United States,* 565 A.2d 964, 967 (D.C.1989), *Anderson v. Sorrell,* 481 A.2d 766, 767 (D.C.1984), *Frendak, supra,* 408 A.2d at 368–69.

The instant case is distinguishable from *Briggs* to the extent that the trial judge, presumably in an effort to resolve his concern about appellant's possible insanity defense, questioned appellant concerning his understanding of right and wrong on the day of the assault. Nevertheless, the judge could not, based on appellant's responses indicating that he had understood right from wrong, properly conclude that there was no longer a sufficient question regarding appellant's insanity on the day of the assault. While the trial judge could properly conclude that appellant was competent to stand trial on the day that the judge conducted his inquiry of appellant, the competency reports described appellant's substantial mental disability very shortly after the assault, referred to appellant's history of schizophrenia, and warned of his continued need for medication in order to remain competent to stand trial.[14] On this basis there was good reason for the judge not only to have a doubt about appellant's insanity on the day of the assault, but to be concerned about the reliability of appellant's answer as evidence of his appreciation of right or wrong on that day.[15] *Cf. Hunter v. United States,* 548 A.2d 806, 810–11 (D.C.1988) (error for judge to rely on personal observations of the defendant as basis to determine competency to enter a plea) (citing *United States v. Masthers,* 176 U.S.App.D.C. 242, 249 & nn. 49–50, 539 F.2d 721, 728 & nn. 49–50 (1976), (citing *Pate v. Robinson,* 383 U.S. 375, 386, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966) (while respondent's demeanor at trial might be relevant to ultimate decision as to his competency, it cannot be relied upon to dispense with a hearing on that issue))).

Accordingly, the combination of appellant's bizarre behavior and attire at the

13. Although appellant did not refuse to submit to productivity examinations ordered by the trial judge, the significance of this fact appears to be that Briggs' unwillingness to cooperate caused the record to lack any expert evaluation of Briggs' productivity. *See Briggs, supra,* 525 A.2d at 593–94. There is similarly no expert evidence concerning appellant's productivity because the trial judge never ordered an examination.

14. A competency finding is only an indication that a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and [that] he [or she] has a rational as well as factual understanding of the proceedings against him [or her]." *Frendak, supra,* 408 A.2d at 379 (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)).

15. There was no expert evidence of record indicating that a person who fails to appreciate the difference between right and wrong on a particular day is capable of relating this fact on a later date. *Cf. Frendak, supra* note [1], 408 A.2d at 380 n. 29 (persons who suffer from mental illness often engage in denial).

time of the offense and the psychiatric reports indicating a serious mental illness leaves a "sufficient question" regarding appellant's insanity on the day of the assault to require a *Frendak* inquiry, and we remand the case to the trial court for further proceedings.