James V. ROBINSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 85–1073, 88–1015.

District of Columbia Court of Appeals.

Argued June 29, 1989.
Decided Oct. 5, 1989.
As Amended on Denial of Rehearing
Nov. 17, 1989.

---

Daniel M. Schember, Washington, D.C., for appellant.

James V. Robinson, pro se.

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Patricia A. Riley, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before FERREN and STEADMAN, Associate Judges, and MACK, Associate Judge, Retired.*

---

* Judge Mack was an Associate Judge of the Court at the time of argument. Her status changed to Associate Judge, Retired, on October 1, 1989.

FERREN, Associate Judge:

A jury convicted appellant of first-degree burglary, D.C.Code § 22–1801(a) (1981), and rape, *id.* § 22–2801. He contends on appeal, primarily, that the trial court: (1) abused its discretion in failing sua sponte to conduct an inquiry to ascertain appellant's capacity to waive an insanity defense; (2) committed reversible error in failing to conduct an inquiry into appellant's pretrial claim of ineffective assistance of counsel when appellant told the court before trial that he wanted a new lawyer; and (3) abused its discretion in denying his post-trial motion for access to a tape of a portion of the trial proceedings. Appellant also claims that he was denied effective assistance of counsel at trial and that the trial court erred in admitting prior statements of a witness under the excited utterance exception to the hearsay rule. We affirm.

## I.

The jury found that appellant broke into the house of his next-door neighbor and raped her. Earlier, at appellant's presentment on July 25, 1984, the government had requested a competency report, notifying the trial court that appellant had been talking to himself when the police arrived to arrest him and that he had been released from the Marines with a mental disability (a fact that appellant initially denied). The court ordered a forensic screening. At a hearing the following day, the court found appellant incompetent to stand trial after reviewing a doctor's report that concluded appellant would not communicate adequately with an attorney at that time. The report described appellant as "somewhat theatrical" and said that appellant "seemed paranoid, but not extremely so," and was "probably not psychotic." The court ordered a screening to be conducted at the D.C. jail. The next day the trial court also ordered an additional competency report, as well as a productivity report (a psychiatric examination to determine appellant's sanity at the time he allegedly committed the offense), to be completed by September 25, 1984.

At a hearing on September 25, the court read aloud from a September 12, 1984, psychiatric report opining that appellant was presently incompetent to stand trial "by virtue of suffering from a Paranoid disorder which renders him unable to assist counsel appropriately in his own behalf." The report noted the following: appellant was drawing 50% disability after having been discharged from the Marines with a "Paranoid" diagnosis; appellant was refusing medication; and appellant had been described by other doctors as hostile, tense, and exhibiting paranoid trends and disruptive and inappropriately confrontive behavior. The report also informed the court that appellant's attorney found appellant's "persecutory ideation and preoccupation with legalistic trivia" hindered discussion of an appropriate defense. The trial judge found appellant incompetent to stand trial and committed him to Saint Elizabeths Hospital for thirty days for treatment and for a productivity exam.

On October 30, 1984, the court presented to counsel an October 25, 1984, psychiatric report which concluded in somewhat summary fashion that appellant both was competent to stand trial and had not been insane at the time of the alleged crime.[1] The report also stated that appellant had been diagnosed as mentally ill and that the medication appellant was currently receiving should continue pending trial to assure continued competency.[2] Without objection

---

1. The report stated that appellant had a rational and factual understanding of the proceedings against him and was able to consult with counsel. Concerning appellant's productivity, it said:
   [O]n or about July 25, 1984, the date of the alleged offenses, he was not suffering from a mental disease or defect which substantially impaired his behavioral controls, and the alleged offenses, if committed by him, were not the product of a mental disease or defect; nor as a result of a mental disease or defect did he lack substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

2. More specifically, appellant was diagnosed as Bipolar Disorder, Manic with Psychotic Features, Paranoid Personality and Mixed Personality Disorder with Narcissistic, Antisocial and

from either counsel, the court found appellant competent and proceeded to arraign him.[3]

■ Appellant, who did not raise an insanity defense at trial, now argues that the trial court abused its discretion in failing sua sponte to conduct a *Frendak* inquiry into whether he was competent to waive the defense. *See Frendak v. United States*, 408 A.2d 364, 380 (D.C.1979) ("[W]henever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense."). We disagree. In *Briggs v. United States*, 525 A.2d 583, 593 (D.C.1987), this court concluded that a trial judge had abused his discretion by not sua sponte conducting a *Frendak* inquiry. Under the circumstances of that case, where no productivity exam had been conducted before trial, we found three factors significant: (1) the defendant's bizarre pretrial behavior, including an illustrated correspondence with the trial judge and pro se pleadings replete with biblical references and a "handwritten colloquy among 'Steny H. Hoyer,' 'Satan,' and 'God and Christ' "; (2) detailed psychiatric evaluations by three psychiatrists diagnosing the defendant as suffering from paranoid schizophrenia, a long-term mental illness, and questioning his competency to stand trial; and (3) the defendant's steadfast refusal to answer productivity questions. *Id.* at 584, 587, 592–93. Although the trial court in *Briggs* had twice ordered productivity examinations, such examinations had never been conducted because of the defendant's resistance. *Id.* at 592. We found that the expert psychiatric opinions and other evidence before the trial judge raised a "substantial question" concerning the defendant's competency to waive the insanity defense, and we concluded that the trial court accordingly had erred in proceeding to trial without undertaking a *Frendak* inquiry. *Id.* at 592–93.

In the present case, there was evidence before the trial judge indicating that appellant might have been insane when he committed the rape and burglary: he was twice found incompetent to stand trial, expert opinion indicated he was suffering from a long-term paranoid disorder, and he had exhibited disruptive behavior at the D.C. Jail and at Saint Elizabeths Hospital. The trial judge, however, also had available the results of a productivity examination in which an expert psychiatrist had rendered his opinion that appellant was not insane at the time of the alleged offenses. Counsel on appeal disparages the results of this examination as a "conclusory form letter notice of non-productivity." Counsel argues that if the trial court had conducted a timely *Frendak* inquiry before a court-ordered productivity study, the court might have found appellant incompetent to waive an insanity defense and appointed an amicus curiae to investigate the strength of the insanity defense. Amicus, then, might have interviewed the doctors who eventually made the productivity study and, as a result, might have helped these doctors develop information about appellant's past that could have led to a conclusion that appellant was, in fact, insane at the time of the offense.

Contrary to counsel's assumption, in the absence of a defendant's announced desire to waive an insanity defense, *Anderson v. Sorrell*, 481 A.2d 766 (D.C.1984), does not require a *Frendak* inquiry before the court orders a productivity examination. In any event, in light of an unchallenged expert's report finding no productivity, counsel's argument is simply too speculative. After considering all the evidence before the trial judge at the time of trial, we cannot conclude the record raised " 'a substantial question of the defendant's sanity at the

Borderline Trends, and was receiving Lithobid, 900 milligrams t.i.d.

**3.** On October 29, 1984, the Chief of the Pre–Trial Branch, Division of Forensic Programs wrote the clerk of the Criminal Division of the Superior Court to inform the court that appellant "had made threats of bodily harm to the [St. Elizabeths] Hospital staff if released from custody."

time of the crime' " sufficient to trigger a trial court responsibility to initiate a *Frendak* inquiry. *See Briggs*, 525 A.2d at 592 (quoting *Frendak*, 408 A.2d at 380).

## II.

■ Appellant argues that the trial court committed reversible error in failing to conduct a *Monroe-Farrell* hearing when he told the court before trial he wanted a new lawyer. *See Farrell v. United States*, 391 A.2d 755 (D.C.1978); *Monroe v. United States*, 389 A.2d 811 (D.C.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). Over the course of the pretrial proceedings, appellant made numerous indications that he wanted a new lawyer. At the September 25, 1984, competency hearing he twice said that he wanted a new lawyer, alluding to the failure of his counsel to take any action concerning his problems at the D.C. Jail, but the court ignored him. On October 30, 1984, appellant again asked for another lawyer; the trial judge told him to put his request in a written motion and to send it to the court. In a letter to the court on January 7, 1985, appellant indicated that he had doubts about his lawyer because, in filing motions to reduce his bond, which the court had denied, counsel had failed to raise the unlikelihood of appellant's flight to visit his estranged wife in Ohio.

It was not until the first day of appellant's second trial,[4] when his counsel informed the court that appellant believed he needed a new lawyer, that the court responded by asking appellant to elaborate. After the court asked, "What's your problem, sir?" appellant responded that the issue concerning him was his inability to obtain his release from jail, even though he had sufficient money in his inmate account to pay his bond. The trial judge promised to call the jail to investigate the matter. Appellant then proceeded to complain about his lawyer's failure to take any action concerning the brutality he allegedly had suffered at the D.C. Jail. After remarking that he believed the abuse might

have been the result of a conspiracy between complainant and officers at the jail, appellant said he was ready for trial and that he expected his current counsel to be his lawyer as long as she conducted herself as a professional. The judge then called in the jury, which was duly sworn.

The *Monroe-Farrell* line of cases provides that, when a defendant makes a pretrial challenge to the effectiveness of counsel and requests the assistance of new counsel "on the ground that counsel, due to lack of investigation, preparation, or other substantial reason, is not rendering reasonably effective assistance, the trial court has a constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." *Monroe*, 389 A.2d at 820. The inquiry should include questions to the defense counsel and to the defendant designed to elicit whether counsel had conducted appropriate investigation, both factual and legal, and had allowed enough time for reflection and preparation for trial. *Id.* at 821.

■ The government argues that appellant's general assertions that he wanted a new lawyer did not constitute complaints concerning lack of preparation for trial sufficient to trigger a trial court responsibility to conduct a full-fledged *Monroe-Farrell* inquiry. We agree. If, however, as was almost the case here, a trial court does not permit a defendant to explain why he or she wants a new lawyer, a pretrial ineffective assistance of counsel inquiry could forever be avoided because the defendant would never be able to articulate the lack of preparation or communication necessary to trigger the inquiry. In the present case, the trial court erred by not responding to appellant's many indications that he wanted a new attorney. This court stated in *Farrell*, 391 A.2d at 762 n. 3, that "the necessity for strict judicial observance of the Sixth Amendment duty of inquiry is especially apparent in situations ... in which the circumstances of the offense (coupled with the fact that the trial court deemed it necessary to have a psychiatric

---

**4.** Appellant's first trial, which began on February 6, 1985, ended in a mistrial. At the first

trial, appellant made no complaints concerning his counsel.

competency evaluation of appellant made) suggest that the defendant may be experiencing some type of psychiatric disorder."

We perceive no prejudice in the trial court's error, however, because of subsequent events. On the first day of appellant's second trial, the court did provide appellant an opportunity to state the basis for his desire for a new attorney. After articulating nothing to indicate that he was dissatisfied with counsel's preparation for trial, appellant himself concluded that he was ready and willing to go forward with his present attorney. Under these circumstances, we do not believe the trial judge erred in failing to conduct a *Monroe-Farrell* inquiry before trial. Nor was appellant prejudiced by the trial court's failure to seek elaboration in response to appellant's earlier motions.

### III.

■ Appellant contends that the trial court abused its discretion in denying his post-trial motion for access to a tape of a portion of the trial proceedings. He claims that the court wrongly considered his motion as a request for information to support a new trial motion on grounds of newly discovered evidence, *i.e.*, a collateral attack on his conviction. Appellant maintains that his motion was not such an attack but, rather, was a mere assertion of his common law right of access to judicial records. Accordingly, he argues, the trial court should have exercised its discretion pursuant to *Mokhiber v. Davis*, 537 A.2d 1100, 1115–17 (D.C.1988), to determine whether the tape should be released.

We cannot accept appellant's characterization of his motion. In preparation for the motion, appellant's counsel had sought funds pursuant to the provisions of the Criminal Justice Act (CJA), D.C.Code §§ 11–2601, –2605 (1989), for research and preparation, as well as for investigative services concerning a collateral attack of appellant's convictions. *See id.* § 11–2601(3)(A) (providing representation to persons financially unable to obtain adequate representation for motions attacking

sentence); *id.* § 11–2605(a) (investigative services may be provided if "necessary for an adequate defense"). On March 16, 1987, appellant's counsel filed a motion for a CJA voucher to prepare a collateral attack on his conviction pursuant to D.C.Code § 23–110 (1981). In the motion, appellant's counsel specifically stated that he had determined that "investigation and possible presentation to this Court of a post-conviction motion based on newly discovered evidence is appropriate." In May 1987, the trial court issued an order granting appellant's motion for the voucher. On May 12, 1988, counsel for appellant made an ex parte application for investigative services pursuant to D.C.Code § 11–2605(a) (1989), which Judge Salzman granted on May 13, 1988, for twenty hours of such work.

On May 19, 1988, counsel for appellant filed a motion—the subject of the present appeal—for access to, and a copy of, a courtroom tape-recording. This motion was forwarded to Judge Salzman, to whom the case had been transferred following the death of Chief Judge Moultrie. The motion alleged that appellant had seen the complainant engage in an apparently improper conversation with one of the jurors during a bench conference and that "[e]xpert analysis of the tape recording may enable defendant to establish the contents of any improper communications between [complainant] and the juror and thereby establish that defendant was denied due process of law and his constitutional right to confront his accuser." Counsel for appellant also argued that appellant had a common law right of access to judicial records.

■ We conclude that these motions, viewed together with the scope of appellant's right to representation under the CJA, indicate that appellant's self-styled motion seeking common law relief was, in reality, brought in preparation for a collateral attack on his conviction. Pursuant to this court's decision in *Jenkins v. United States*, 548 A.2d 102, 106–09 (D.C.1988), the trial court's denial of appellant's motion for access to the tape was not an appealable final order, and we therefore lack jurisdiction to consider this matter on appeal.[5]

## IV.

■ Finally, appellant alleges that he received ineffective assistance of counsel at trial and that the trial court erred in admitting prior statements of a witness under the excited utterance exception to the hearsay rule.[6] These claims are without merit.

■ In order to prevail on an ineffective assistance of counsel claim, appellant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Appellant claims many errors by trial counsel, primarily (1) counsel's failure to call certain unnamed witnesses who could testify that they had never seen appellant wear a wig (appellant allegedly wore a wig during the crimes), (2) counsel's failure to subpoena a 911 tape which would show complainant had lied about an alleged incident of harassment by appellant concerning complainant's car, (3) counsel's lack of vigor in cross-examining witnesses on certain issues, and (4) counsel's failure to emphasize certain points in closing argument. We believe these decisions reflect reasonable choices of strategy under the circumstances in a case in which the evidence against appellant was overwhelming.[7] Moreover, appellant has not indicated how his defense was prejudiced by these alleged errors. Finally, his claim of ineffectiveness attributable to counsel's failure to file a speedy trial motion must fail because there was minimal delay (appellant's trial commenced six months after

he was declared competent to stand trial) and because appellant has asserted no prejudice suffered as a result of the delay. *See Graves v. United States*, 490 A.2d 1086, 1101–04 (D.C.1984) (en banc), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).[8]

■ Appellant's evidentiary challenge to the admission of complainant's statement to a detective shortly after the rape also fails. We cannot conclude the trial court erred in admitting the statement under the excited utterance exception to the hearsay rule. *See Nicholson v. United States*, 368 A.2d 561, 564 (D.C.1977).[9]

*Judgment in No. 85–1073 affirmed; appeal in No. 88–1015 dismissed.*

---

5. Appellant's claim (in his pro se brief) that he was denied a fair trial as a result of complainant's conversation with a juror fails for lack of evidence to support it.

6. Appellant's claim that the trial judge's inability promptly to resolve his bond difficulties at the D.C. Jail constituted judicial bias against him is frivolous.

7. At trial, the complainant and her nine-year-old and twelve-year-old sons identified appellant, a man they knew from their neighborhood, as the burglar and rapist, and testimonial and physical evidence was introduced indicating that, shortly after the crime, hairs from appellant's head were found on complainant's pillow case and

that complainant's pubic hair was recovered from a piece of towel found in appellant's bathroom.

8. Appellant's claim that counsel deprived him of the right to participate in voir dire is frivolous because he provides no evidence to support his claim that he was excluded.

9. Nor do we find trial court error in admitting complainant's testimony concerning a letter appellant had sent her, *see Chaabi v. United States*, 544 A.2d 1247, 1248 & nn. 1 & 2 (D.C.1988), or in permitting the introduction of two pieces of cloth seized from appellant's bathroom as one exhibit.