**Donnell DIGGS and Francisco Kipette, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 03–CF–1193, 03–CF–1350.

District of Columbia Court of Appeals.

Argued May 3, 2006.

Decided Aug. 31, 2006.

---

Joanne Vasco, appointed by the court, was on the brief, for appellant Donnell Diggs.

Corinne Beckwith, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant Francisco Kipette.

John P. Mannarino, with whom Kenneth L. Wainstein, United States Attorney, and Roy W. McLeese III, Thomas J. Tourish, Jr., Thomas A. DiBiase, and Jeannie S. Rhee, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, REID, Associate Judge, and NEBEKER, Senior Judge.

REID, Associate Judge:

After a jury trial, codefendants Donnell Diggs and Francisco Kipette were convicted of the lesser-included offense of car jacking after being indicted on the charge

of armed car jacking, in violation of D.C.Code §§ 22–2803, –4504 (2001); unauthorized use of a vehicle, in violation of § 22–3215; and first-degree theft, in violation of § 22–3211.[1] On appeal they contend: (1) the trial court improperly denied their claim that they were deprived of their Sixth Amendment right to a jury drawn from a fair-cross-section of the community;[2] and (2) the trial court erred in denying their motions to suppress identification. Discerning no trial court error, we affirm the judgments of the trial court.

## FACTUAL SUMMARY

The government presented testimony showing that on the night of August 8, 2002, around 11:45 p.m., complaining witness Shamar Knighton and his friend, Kizzie McKay, returned from a restaurant in Greenbelt, Maryland, where they had dined, and were seated in Mr. Knighton's vehicle, a Chevy Tahoe truck, outside Ms. McKay's residence in the 1400 block of W Street, in the Northwest quadrant of the District of Columbia. The street lights were on; both the driver's side (where Mr. Knighton was seated) and the passenger side windows were down, and the buildings in the neighborhood were illuminated. Two men approached, one on each side of the vehicle. A man "stuck an object through the window toward Ms. McKay," and Mr. Knighton "felt an object up against [his] face," which "appeared to be a gun." The man on Mr. Knighton's side of the truck ordered him to "empty [his] pockets" and to exit the vehicle before he was shot. Mr. Knighton followed the man's instructions "to go across the street." The man then got into the vehicle. Ms. McKay also was told to get out of the vehicle and "to leave her purse." When Ms. McKay complied, the other man entered the truck on the passenger side.

Mr. Knighton described the assailant on Ms. McKay's side of the vehicle as "about [his] build and stature[,] about [his] height," "a little darker [than himself, but] a dark skinned guy." He had on a black shirt, and something "black" covering his head and his mouth. The man who was on Mr. Knighton's side of the truck was "about 5'9", 5'10", about the same stature as Mr. Knighton, 'lighter' than Mr. Knighton who had been working in the sun— 'light skinned, brown skinned guy.' " Mr. Knighton estimated that "from the time that [he] first saw the man approaching on Ms. McKay's side to the time that [the car jackers] "pulled off" in Mr. Knighton's truck was approximately 45 seconds to one minute.

Mr. Knighton used his cell phone to call 911, and the police responded within "[m]aybe two minutes." After he gave the police a description of the suspects and of his vehicle, the officer asked Mr. Knighton to get into the police car, and then drove down W Street to Fourteenth and U. Soon the officer said that Mr. Knighton's car had been spotted in Maryland. Mr. Knighton was transported to Maryland for a show-up identification. He was shown two men, one at a time. Mr. Knighton identified the men as the perpetrators, saying "yes, that's him" each time. He was "pretty certain" of his identification,

1. Prior to trial, the government dismissed charges of unlawful possession of ammunition and destruction of property. The trial court granted Mr. Diggs' motion for judgment of acquittal on the charge of carrying a pistol without a license. Both defendants were acquitted of the charges of possession of a firearm during a crime of violence, and possession of an unregistered firearm.

2. Mr. Diggs did not address the Sixth Amendment claim in his brief, but on April 27, 2006, he filed a motion "to join and adopt" Mr. Kipette's argument on this issue.

which occurred "roughly 30 minutes" after the car jacking.

Detective Robert Thompson, a thirty-one year veteran of the Metropolitan Police Department ("MPD") testified that on August 8, 2002, he "had monitored a radio run for a car jacking that had just occurred in the 1400 block of W Street, Northwest." He soon learned that the Chevy Tahoe truck had been stopped in Maryland, and proceeded there. Soon after Mr. Knighton arrived on the scene, Detective Thompson told him that he was "going to look at somebody and see if [he] recognizes them." When the suspects were brought to Mr. Knighton for identification, he was "standing on the street[,] approximately . . . maybe twenty feet away. The area was "pretty well" illuminated by street lights." Mr. Kipette was brought out first, and Mr. Knighton was about twenty feet away from Mr. Kipette when he identified him as the person who took his Chevy Tahoe truck. He was "pretty positive" of his identification. When Mr. Diggs was brought out, Mr. Knighton also identified him.

Officer Kevin Griffin, a twenty-seven year veteran of the MPD, testified at the suppression hearing. He was on duty on August 8, 2002, when he was directed to the 1400 block of W Street, N.W. for the purpose of interviewing Mr. Knighton. Mr. Knighton described his assailants as follows: "One suspect was . . . approximately 18–19, black male, dark complected, about five feet eight to five nine in height, 140 to 150 pounds. He was armed with a chrome colored . . . handgun." The second suspect was "a black male, approximately 18–19, wearing a black shirt, white tank T-shirt, he was also armed with a small type handgun or an unknown type handgun." Officer Griffin drove Mr. Knighton to Maryland where his Chevy Tahoe was spotted. He reached Maryland in about fifteen minutes, and the show-up occurred about five minutes later. "One suspect was brought to where [Officer Griffin and Mr. Knighton] were standing, . . . outside [Officer Griffin's] police car." Mr. Knighton "looked at [him]" and "positively identified him," saying, "F—k yeah, that is him." When the second suspect was brought out, Mr. Knighton said, "Yeah, he made me empty my pockets." Officer Griffin did not remember whether Mr. Diggs and Mr. Kipette were handcuffed when they were identified.

## ANALYSIS

### The Sixth Amendment Issue

Appellants contend that "the Superior Court [of the District of Columbia's] systematic method for administering the jury system causes the underrepresentation of African American panelists for trials, like [Mr.] Kipette's, in which the litigants select their juries on Mondays," and hence, "that method violated the Sixth Amendment right to a jury that is chosen from a fair cross section of the community." They claim that "the trial court assumed that the underrepresentation of African Americans in the Monday jury panel was systematic . . . [since] the system is 'skewed towards the white professionals' on Mondays because 'the people who defer [their jury service] have a higher education and economic[ ] level so they exercise their right to defer' and 'because most of the people who defer are put [on] a Monday.' " The government argues that "appellants failed to show that any underrepresentation was 'systematic' . . . , and the trial court did not err in denying their fair cross-section claim."

### The Factual Context

During the voir dire process for the selection of the jury, counsel for Mr. Diggs broached the subject of the jury panel

composition and the low number of blacks (both male and female) on the panel:

> As a kind of fortuity of strikes for cause that have been exercised[,] I think by my calculations we're now left with a panel that's probably about ninety percent composed of white males and females and only about five percent composed of black individuals of either gender.
>
> I think that that's an inappropriate panel from which to choose for a final jury. I would also move for a new panel based upon that breakdown of demographics that we presently have.

The trial court responded, "No," and explained that "[t]he majority of the juries are white, because ... we're having a higher response rate from the white occupants of the city[,] ... the population is closer to equipoise[,][a]nd ... we have a larger percentage of African American[s] ... who ... automatically disqualify themselves for various reasons...." Counsel for Mr. Diggs made no additional comment regarding his request for a new panel. Counsel for Mr. Kipette "join[ed] in [Mr. Diggs'] motion regarding the panel." He estimated "that thirty-six by [his] count of the panel members were white out of the sixty-one, and [he did not] think that that's a fair cross section of any community in D.C." The trial judge disagreed, saying: "I think it is." The judge expressed the view that "the African American population in the city is ... somewhere in the fifties now because we have a large influx of Hispanic population." The judge continued:

> And you have to face the fact that there's a correlation between response to jury summons and people's economic status and their education level and ... that is skewed towards the white professionals who are moving into the city and the populace of the city ... and, particularly on a Monday because most of the people who defer are put to a Monday ...—and so we had a lot of those people. They deferred to the first part of the week on a Monday.
>
> There's also been a correlation of the people who defer [.] [They] have a higher educational and economical level so they exercise their right to defer. So, ... that's representative of the jury panel in this city from what we are seeing.

Mr. Kipette's counsel responded: "[I]f you have a deferment policy that results in a shift in the racial makeup of the jury panels, then ... that's something that's done by the Court. That's an institutional action taken by the Court that I think results—." The judge interrupted to say: "It doesn't—they just get put on Monday." The judge further stated that out of one hundred and eighty people who reported for jury duty, sixty were sent to his courtroom and thirty-six of those were white. The discussion of the jury panel ended at that point. Later, however, the prosecutor indicated that "approximately twenty-three of the sixty original panelists were African American and struck for cause were approximately eleven African Americans and eight white or other ethnicity." At the end of the jury selection process, counsel for Mr. Diggs told the trial judge: "I'll ... renew my challenge [to the jury panel]. [W]e got to the point where our jury panel is disproportionately representative of the white race of the population and not uniformly or more reflective of the community in general. I'd again move for a new panel." Mr. Kipette's counsel joined the motion, and the trial court denied it. Counsel for Mr. Kipette observed that "we have sitting on the jury as a non-alternate only one African American person," and he suggested that the alternates be "reselect[ed]." The trial judge replied:

No. We have one African American female in seat number five, one seat number eleven. The rest of the panel seems to be Caucasian but they were fairly selected so that will be denied.

*The Applicable Legal Principles*

 A fundamental principle of our law is that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Indeed, "[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *United States v. Weaver*, 267 F.3d 231, 236 (3d Cir.2001) (quoting *Taylor, supra*, 419 U.S. at 527, 95 S.Ct. 692). "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Carle v. United States*, 705 A.2d 682, 685 (D.C. 1998). *See also Weaver, supra*, 267 F.3d at 236 (" '[T]he jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.' ") (quoting *Taylor, supra*, 419 U.S. at 527, 95 S.Ct. 692); *United States v. Royal*, 174 F.3d 1, 6 (1st Cir. 1999)) ("[The] requirement of a fair cross-section ... does not guarantee that juries be 'of any particular composition.' ") (quoting *Taylor, supra*, 419 U.S. at 538, 95 S.Ct. 692); *Commonwealth v. Arriaga*, 438 Mass. 556, 781 N.E.2d 1253, 1262 (2003)) ("The right to trial by a jury drawn fairly from a representative cross section of the community serves the critical purposes of guarding against the exercise of arbitrary power and making available the common-sense judgment of the community.") (citation omitted).

*Application of the Legal Principles*

Although we did not decide in *Carle, supra*, whether African Americans constitute a distinctive group under the first prong of the *Duren* test, the government concedes that African Americans are a "distinctive group" for the purposes of a fair-cross-section analysis. Other courts have determined that African Americans are "unquestionably a 'distinctive' group for the purposes of a fair-cross-section analysis." *Royal, supra*, 174 F.3d at 6 (citing *United States v. Hafen*, 726 F.2d 21, 23 (1st Cir.1984)) (other citation omitted). *See also Ohio v. Jackson*, 107 Ohio St.3d 53, 836 N.E.2d 1173, 1192 (Ohio 2005).

 As for the second *Duren* prong, we conclude that appellants failed to establish that "the representation of [African Americans] from which [District of Columbia] juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Duren, supra*, 439 U.S. at 364, 99 S.Ct. 664. To satisfy the second prong, appellants "must demonstrate the percentage of the community made up of the group alleged to be underrepresented, [because] this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Id.* Moreover, courts generally rely on two concepts or measures (there are others) to determine "whether the dis-

tinctive groups' representation is fair and reasonable in relation to their representation in the community . . .: absolute and comparative disparity." [3] *United States v. Orange,* 447 F.3d 792, 798 (10th Cir.2006) (citations omitted); *see also* Peter A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel,* 103 Yale L.J.1913, 1917–20 (1994). These measures of fair and reasonable representation require statistical data. In *Duren,* the appellant proffered statistics showing the actual percentage of women in the community. *Duren, supra,* 439 U.S. at 364–65, 99 S.Ct. 664. *See also Thomas v. Borg,* 159 F.3d 1147, 1150 (9th Cir.1998), *cert. denied,* 526 U.S. 1055, 119 S.Ct. 1365, 143 L.Ed.2d 526 (1999) (noting that the second prong of *Duren* requires proof, "typically statistical data" to establish the percentage of the community purported to be made up of the underrepresented group). Similarly, in *Obregon v. United States,* a case challenging the jury selection process on the basis that it excluded people with Spanish surnames, the appellant offered census figures and expert testimony to establish the number of people in the District of Columbia who were of Hispanic origin. 423 A.2d 200, 202 n. 3 (D.C.1980). But here, as the government argues, "appellants presented no evidence to the trial court regarding the demographic makeup of the District of Columbia."

Mr. Kipette states, for the first time on appeal, that 60% of the District's population is comprised of African Americans according to the most recent census data, but that statistic alone is inadequate to satisfy Duren's second prong. At trial, both Mr. Diggs and Mr. Kipette merely argued that there were too few African American jurors on the panel. Mr. Diggs' original objection asserted that the court was "left with a panel that's probably about ninety percent composed of white males and females and only about five percent composed of black individuals of either gender," and he moved for a new panel based upon the "breakdown of demographics that we presently have." In joining Mr. Diggs' motion for a new panel, Mr. Kipette objected for the first time on Sixth Amendment grounds by stating that "thirty-six . . . of the [original sixty-one] panel members were white" and that this was not "a fair cross section of any community in D.C." Later, Mr. Diggs renewed his objection to the panel, stating that "[the] jury panel [was] disproportionately representative of the white race of the population and not uniformly or more reflective of the community in general." In their brief, appellants belatedly attempt to show a statistical disparity "of 22 percent between the 38 percent of the panel that was African American and the 60 percent of the population of the District of Columbia," using "the government's assessment of the racial breakdown of the jury panel, which was that 23 of 60 panel members were African American." But even assuming that this limited statistical picture could satisfy the second *Duren* prong, there are two problems. First, that statistical disparity picture was not presented to the trial court, and second, it could not satisfy the third *Duren* prong.

The third *Duren* prong requires appellants to demonstrate "that this underrepresentation [of the distinctive group in the community] is due to systematic

**3.** "Absolute disparity is determined by subtracting the percentage of a group in the jury wheel [or jury pool] from the percentage of that same group in the general population. Comparative disparity is determined by dividing the absolute disparity of a group by the percentage of that group in the general population." *Orange, supra,* 447 F.3d at 798 (citations and internal quotation marks omitted).

exclusion of the group in the jury selection process." *Duren, supra,* 439 U.S. at 364, 99 S.Ct. 664. A showing of systematic exclusion must be based on more than statistical evidence relating to the jury pool in one case. As the Supreme Judicial Court of Massachusetts declared:

> A defendant must do more than assess a small subsection of the venire present on a particular day in order to show that the group allegedly discriminated against is not fairly and reasonably represented in the venires in relation to its proportion of the community. A defendant must present evidence of a statistically significant sample, usually requiring analysis of the composition of past venires.

*Arriaga, supra,* 781 N.E.2d at 1263–64 (citations omitted); *see also United States v. Hill,* 197 F.3d 436, 445 ("This circuit and others have repeatedly emphasized that ... evidence of a discrepancy on a single venire panel, is insufficient to demonstrate systematic exclusion.") (citing *United States v. DeFries,* 327 U.S.App.D.C. 181, 189, 129 F.3d 1293, 1301 (1997) (per curiam)); *Phea v. Benson,* 95 F.3d 660, 662 (8th Cir.1996); *United States v. Ruiz–Castro,* 92 F.3d 1519, 1527 (10th Cir.1996)) (other citation omitted). Furthermore, "a statistical showing alone, without some analysis of the particular system involved, is [in]sufficient to prove systematic exclusion." *Obregon, supra,* 423 A.2d at 206; *see also Harlee v. District of Columbia,* 558 A.2d 351, 353 (D.C.1989) (appellant fails to establish the third *Duren* prong where "record is devoid of any evidence, statistical or otherwise, showing that the alleged underrepresentation ... was due to ... systematic exclusion from the District's random selection process."). *See also United States v. Rodriguez–Lara,* 421 F.3d 932, 945 (9th Cir.2005) (appellant could not prevail on fair-cross-section challenge because hypothesis as to the cause of the underrepresentation, without evidence to support it fails to satisfy the third prong of *Duren*).

Appellants make some attempt to establish that African American "representation on Monday jury panels in Superior Court is disproportionately low compared to their percentage of the population," and that African American "representation on [their] jury, in particular, evinced a disparity that far exceeded the ten percent disparity that typically establishes underrepresentation in a jury venire." However, appellants presented no evidence in the trial court that African Americans were excluded regularly from Monday jury panels. In contrast, in *Duren* the appellant provided statistical proof of a discrepancy in every weekly venire for nearly a year. *Duren, supra,* 439 U.S. at 364–65, 99 S.Ct. 664. Here, appellants rely mainly on the trial court's remarks that "there's a correlation between response to jury summons and people's economic status and their education level ... that is skewed towards the white professionals ... particularly on a Monday because most of the people who defer are put to a Monday." But, the trial court's mere conjecture about why panels might have more white jurors on Monday cannot establish systematic exclusion of African Americans from Monday jury pools.[4]

---

4. Appellants also appear to rely on other statements made by the trial court. When the trial judge denied Mr. Diggs' motion for a new panel following the strikes for cause, he noted that the population of African Americans in the District "is closer to equipoise." Later the trial court remarked that the panel was a fair-cross-section of the community because "the African American population in the city is ... somewhere in the fifties now." Just as the unsupported statements of counsel do not amount to evidence, the trial court's unsupported estimation that the percentage of African Americans in the District is "some-

Appellants in *DeFries, supra,* singled out a procedure used in the jury office which gave liberal hardship deferrals to whites in the jury pool and then recalled them *en masse.* They argued that under this procedure, "white jurors were systematically underrepresented in the juror pool they received," and that "[t]his disparity . . . is due in part to the fact that potential white jurors were more likely than nonwhites to obtain hardship deferrals of their jury service—at least half of the fifty-four deferrals in the jury pool used by the district court for the venire in appellants' trial were white." 327 U.S.App.D.C. at 187, 129 F.3d at 1299, 1300. Appellants presented more statistical data in the district court than Messers Kipette and Diggs introduced in the trial court in this case, but the federal appellate court, although believing that "[t]he import of appellant['s] evidence is troubling," *Id.* at 189 n. 5, 129 F.3d at 1301 n. 5, nevertheless concluded that it was insufficient to establish systematic exclusion:

> Appellants contend that the disparity between the percentage of whites in their venire and the percentage of eligible white jurors in the District of Columbia suggests that whites are systematically excluded from juries in the district court. They point to the evidence that although whites comprise approximately one-third of the eligible jurors in the district, they comprised only 23% of the venire in their case. Yet appellants cannot show on the basis

of this single instance of disparity that there has been a systematic exclusion of whites from the jury. Underrepresentation of a cognizable group in a single venire, without evidence of a greater pattern, is insufficient to establish the "systematic exclusion of the group" required by *Duren.* From a small sample size based on one venire it is difficult to determine whether the disparity is random or systematic.

*Id.* at 189, 129 F.3d at 1301 (citing *Duren, supra,* 439 U.S. at 364, 99 S.Ct. 664 (other citations omitted)). The same can be said in this case. Simply put, although the allegations concerning hardship deferrals and the Monday composition of the jury pool are "troubling," *Id.* at 189 n. 5, 129 F.3d at 1301 n. 5, appellants cannot prevail on their Sixth Amendment claim, because they presented insufficient evidence at trial to support it.

### The Identification Challenge

■ Mr. Diggs essentially contends that the trial court erred by not granting his motion to suppress identification testimony from one of the complaining witnesses, Mr. Knighton, because: "From the time of [Mr.] Knighton's initial contact with [Officer] Griffin on W Street, to the time he was walked up from [Officer] Griffin's car to look at the two suspects, he was fed information which rendered the actual identification a mere formality." He claims that the procedure used for the show-up identification was both

---

where in the fifties" is not evidence on which appellants can now rely. *See Brown v. United States,* 627 A.2d 499, 505 (D.C.1993) (appellant's remarks that community is 70% African American but his jury panel was about 80% Caucasian was insufficient to establish a prima facie Sixth Amendment fair-cross-section claim). *See also* Brenda C. See, *Written in Stone? The Record on Appeal and the Decision Making Process,* 40 Gonz. L.Rev. 157, 190 (2004/2005) ("The judge's personal

knowledge of a topic is not sufficient to allow him or her to take judicial notice of that information; the court must find that the accuracy of the fact or its source is an uncontested matter of public knowledge."); 9 WIGMORE ON EVIDENCE § 2569, at 723 (1981) ("It is . . . plainly accepted that the judge is not to use from the bench, under the guise of judicial knowledge, that which he knows *only as an individual* observer outside of court.") (emphasis in original).

unnecessarily suggestive and unreliable. Similarly, Mr. Kipette argues that the identification was suggestive because of the following: Mr. Knighton was told that the police "caught" or "got" the perpetrators, Mr. Kipette was in handcuffs at the time of his identification, and "was surrounded by at least ten police officers and numerous police vehicles . . .," and "in view" of the complainant's car jacked automobile. The government asserts that under *Maddox v. United States,* 745 A.2d 284 (D.C.2000), the show-up identification was not impermissibly suggestive; nor was it unreliable under the factors articulated in *In re L.G.T.,* 735 A.2d 957, 959 (D.C.1999).

While the trial court determined that there was "some suggestivity" in the show-up procedure, the court did not characterize it as impermissibly suggestive. Moreover, the court concluded that the procedure used was "not so suggestive as to undermine the reliability and the certainty [of the identification]." With respect to reliability, the trial court specifically found that when the car jacking was committed, Mr. Diggs and Mr. Knighton were "within a foot of each other. They [were] within inches of each other." And, Mr. Knighton "was very focused," describing complexion, age, and build. With respect to Mr. Kipette, the judge found that Mr. Knighton "saw enough," had "at least a minute" to view Mr. Kipette, and was asked to identify him "[w]ithin an hour" of the commission of the crime.

■■■■■■ "A defendant who moves to suppress an identification, in order to prevail on his motion, must show that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.'" *Forte v. United States,* 856 A.2d 567, 573 (D.C.2004) (citing *Turner v. United States,* 622 A.2d 667, 672 n. 4 (D.C.1993)

(citing *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). "[I]f the procedure is found impermissibly suggestive, the government may defeat the motion and save the identification by carrying the burden of producing evidence to show that, under all the circumstances, the identification was reliable nonetheless." *Id.* (citing *Maddox, supra,* 745 A.2d at 292) (other citations omitted). In determining whether a statement is reliable, we examine such factors as: " 'the opportunity of the witness to view the [suspect] at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the [suspect], the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.' " *In re L.G.T., supra,* 735 A.2d at 959 (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)).

■■■■■■ We have said previously that the presence of the police at the scene of the showup identification does not necessarily manifest impermissible suggestivity. "[S]omething more egregious than mere custodial status is required" to establish impermissible suggestivity. *Singletary v. United States,* 383 A.2d 1064, 1068 (D.C. 1978) (citation omitted). In addition, "the fact that appellant was handcuffed during the showup [does not] establish impermissible suggestivity." *Forte, supra,* 856 A.2d at 573 (citing *Fields v. United States,* 484 A.2d 570, 574 (D.C.1984)). Nor does a police officer's statement, made to a witness, that: "[W]e got two guys in the car similar to the ones you told us about" indicate undue suggestivity. *Singletary, supra,* 383 A.2d at 1068–69 (citing *Washington v. United States,* 334 A.2d 185, 187 (D.C.1975). We must examine the showup identification in the totality of the circumstances. Consequently, "[a]lthough single-suspect identifications in the presence of police are obviously suggestive to

some extent, [as the trial court recognized here], 'a defendant is not denied due process of law unless, in the totality of the circumstances, the on-the-scene confrontation was *unnecessarily* suggestive and conducive to the substantial likelihood of irreparable misidentification.' " *Forte, supra,* 856 A.2d at 573 (quoting *Singletary, supra,* 383 A.2d at 1068 (emphasis added) (other citation omitted)). Based upon our review of the record, we are satisfied that appellants have not shown a very "substantial likelihood of misidentification." *Id.* (internal quotation marks omitted).

■ Moreover, even assuming that the showup was unnecessarily suggestive, the identification of appellants by Mr. Knighton was reliable, as the trial court found; the Chevy Tahoe truck had been stopped in Maryland soon after the car jacking and Messers Diggs and Kipette were apprehended. At the time of the crime, Mr. Knighton had a good opportunity, in a well-lit area to view the appellants, and he provided a rather detailed physical description of them. The trial court found that his level of certainty with respect to his identification was "emphatic," and that the time of the identification was within one hour of the crime. Under these circumstances, we see no reason to disturb the trial court's finding of reliability. Therefore, "[w]e hold that the trial court committed no error in denying appellant[s'] motion to suppress [their] identification because the decision was 'supported by the evidence and in accordance with the law.' " *Forte, supra,* 856 A.2d at 573 (quoting *Turner, supra,* 622 A.2d at 672 n. 3) (other citation omitted).

Accordingly, for the foregoing reasons, we affirm the judgments of the trial court.

*So ordered.*