**Melvin HOWARD, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 05–CF–1329.**

District of Columbia Court of Appeals.

Argued June 12, 2008.

Decided Aug. 7, 2008.

but does not appear to have availed himself of that invitation.

Thomas T. Heslep, Washington, for appellant.

Michael T. Ambrosino, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, Roy W. McLeese III, Thomas J. Tourish, Jr., and Stephen J. Gripkey, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and THOMPSON, Associate Judges, and FARRELL, Associate Judge, Retired.*

RUIZ, Associate Judge:

Appellant was convicted of carjacking while armed, D.C.Code § 22–2803(b); possession of a firearm during a crime of violence or dangerous offense, D.C.Code § 22–4504(b); carrying a pistol without a license, D.C.Code § 22–4504(a); possession of an unregistered firearm, D.C.Code § 7–2502.01; unlawful possession of ammunition, D.C.Code § 7–2506.01(3); and unlawful use of a vehicle, D.C.Code § 22–3215. On appeal, he argues that the trial court erred in deeming him competent to stand trial, in failing to obtain a waiver of the insanity defense or to explore the option of imposing one upon him, and in

---

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

failing to grant his motion to suppress two show-up identifications. We affirm.

## I.

On August 30, 2003, appellant, posing as a window washer at a gas station, sprayed Susan Saffer in the face with window cleaner and forced her to give him the keys to her car after displaying a gun in his waistband. As appellant drove away in Ms. Saffer's car, her friend, Patricia Elliot, flagged down a nearby police officer, who immediately gave chase and broadcasted a lookout description. Appellant crashed the car during the chase, and the officer saw appellant exit the vehicle and run past the police car, at which point the officer chased him on foot. After briefly losing sight of appellant, the officer eventually found him hiding behind a trash can. When appellant was apprehended and placed in handcuffs, Ms. Saffer and Ms. Elliot were brought in separate police cars for show-up identifications, conducted fourteen minutes after the carjacking, during which there was no communication between the two witnesses. Both witnesses immediately identified appellant as the perpetrator.

Upon arrest, appellant turned mute and non-responsive, even with his own counsel and investigator; defense counsel so reported to the trial court. The trial court ordered a mental health evaluation of appellant. The evaluation was conducted in November 2003, during which appellant did not respond to any of the examiner's inquiries. The trial court subsequently ordered a competency examination, but the examining psychiatrist was unable to assess appellant's competency due to his continued non-responsiveness to verbal and written communication and his refusal to cooperate with the examiner. The trial court then ordered a full competency evaluation at St. Elizabeths Hospital, where appellant was admitted in April 2004. Dr. Michael Sweda, a clinical psychologist at the hospital, examined appellant upon admission and diagnosed him with schizophrenia, catatonic type, and personality disorder NOS (Not Otherwise Specified) with antisocial features, and deemed him incompetent to stand trial. During several subsequent competency evaluations, appellant was deemed equally incompetent to stand trial. However, as of February 2005, after having received medication for his condition, appellant had suddenly begun speaking, and the hospital informed the court that appellant had become competent to stand trial. In April 2005, the hospital issued a detailed report stating that Dr. Sweda had re-examined appellant, deeming him competent to stand trial, competent to waive the insanity defense, and criminally responsible for the offense. In subsequent examinations dating up until trial, the hospital continued to deem appellant competent to stand trial.

Although appellant was mute and non-responsive in the presence of his counsel and the court throughout the preliminary hearings and the trial, St. Elizabeths Hospital reported that appellant had been communicating freely with doctors and staff at the hospital during that time. Dr. Sweda and Dr. Richard Ratner, a psychiatrist at St. Elizabeths, both concluded after examining appellant that his muteness was volitional, and the government presented other evidence demonstrating the volitional nature of appellant's selective silence.[1]

---

1. The government cited the following from appellant's clinical record: appellant suddenly began speaking on February 10, 2005; when asked if his prolonged silence was merely "an act," appellant smiled and said that his silence was for his "well being"; appellant refused to answer questions as to why he had been silent so long; when asked

In July 2005, when appellant once again ceased communicating with defense counsel, he challenged the government's assertion of appellant's competency to stand trial. The trial judge conducted a competency hearing in August 2005, during which Dr. Sweda testified as the sole witness. The judge ruled that appellant was competent to stand trial.

The judge conducted a hearing on appellant's motion to suppress the identification testimony from the two show-up procedures. The judge found that the procedures were not unduly suggestive and denied the motion to suppress. After trial, a jury convicted appellant of all charges.

## II.

### A. Competency to Stand Trial

■■■■ Appellant claims that the trial court's competency findings were erroneous. Competency determinations are within the trial judge's discretion and are afforded deference. See Bennett v. United States, 400 A.2d 322, 325 (D.C.1979). "A finding of competency will not be set aside upon review unless it is 'clearly arbitrary or erroneous.'" Id.(quoting United States v. Caldwell, 178 U.S.App. D.C. 20, 36, 543 F.2d 1333, 1349 (1974)). The test for determining competency to stand trial is whether the defendant has "sufficient present ability to rationally consult with his attorney and to factually understand the nature of the proceedings against him." Phenis v. United States, 909 A.2d 138, 152 (D.C.2006) (citation omitted). In

this case, the trial judge's competency findings were not clearly erroneous.

The trial judge's ruling is supported by four successive reports issued by St. Elizabeths Hospital, dating from February 2005 to the commencement of trial in August of the same year, deeming appellant competent to stand trial and by Dr. Sweda's testimony at the competency hearing that appellant was competent to stand trial, and that his refusal to communicate with defense counsel and silence in the courtroom were volitional.[2] Appellant presented no evidence at the competency hearing to contradict the four hospital reports or Dr. Sweda's testimony. In addition, the trial judge relied on his personal observations of and conversations with appellant, to which we accord deference. See Wallace v. United States, 936 A.2d 757, 774 (D.C. 2007) (citing Edwards v. United States, 766 A.2d 981, 988 (D.C.2001)). Concededly, due to appellant's decision not to communicate, he may not have "rationally consult[ed] with his attorney" and thus may have been less likely to "factually understand the nature of the proceedings against him," Phenis, 909 A.2d at 152, but the test for competency hinges solely upon whether there was a "sufficient present ability" to do so. Id. at 152 (emphasis added); see also Godinez v. Moran, 509 U.S. 389, 404, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (Kennedy, J., concurring) ("The possibility that consultation will occur is not required for the standard to serve its purpose."). Therefore, the trial judge did not clearly err in ruling, based on ample, uncontested evidence, that appellant had

questions about his competence, he appeared to have a factual understanding of his charges and the legal proceedings; appellant later admitted that his muteness was voluntary and stated that he began talking so that the staff would not "kill him" with medication; appellant's phone privileges were restricted because he was talking excessively on the phone; and appellant expressed a working

knowledge of the proceedings and a desire to take the case to trial.

2. The trial court noted that Dr. Sweda's findings of competency and the volitional nature of appellant's silence were corroborated by Dr. Ratner, who reached the same conclusions.

such sufficient present ability and was thus competent.

Appellant now contends that the trial judge should have further examined the question of whether appellant's silence was actually volitional, or rather, the result of his underlying mental illness. He specifically asserts that because his silence persisted throughout trial to the detriment of his defense, the trial court should have explored *sua sponte* the possibility that his behavior was the result of mental illness. However, it is not the trial judge's role to play "armchair psychiatrist" and further probe the issue of competency *sua sponte* where there are no red flags indicating to the judge that there exists a need to do so. *See Bennett,* 400 A.2d at 325. Here, where appellant presented nothing to contest the government's evidence at the competency hearing, and where the trial judge relied on his personal observations, four consecutive hospital-issued reports finding appellant competent, and the testimony of appellant's treating clinical psychologist, which was corroborated by a psychiatrist, no substantial doubt as to appellant's competency was raised.

### B. Waiver of Insanity Defense

■ Appellant asserts that the trial court's failure to *sua sponte* obtain a waiver of the insanity defense, or to explore the option of imposing an insanity defense upon appellant, constituted error. We affirm on the basis that the evidence did not raise a substantial question of appellant's sanity at the time of the offense, and thus the trial judge did not abuse his discretion by failing to conduct a *Frendak* inquiry.

■ "[T]he law presumes that every one charged with crime is sane," *Davis v. United States,* 160 U.S. 469, 486, 16 S.Ct. 353, 40 L.Ed. 499 (1895), so "the defendant has the burden of proving insanity by a preponderance of the evidence." *Patton v.*

*United States,* 782 A.2d 305, 311 (D.C. 2001) (citing D.C.Code § 24–301(j)). To establish a *prima facie* case of insanity, "the defendant must present sufficient evidence to show that 'at the time of the criminal conduct, as a result of mental disease or defect, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law.' " *Id.* at 312 (quoting *Pegues v. United States,* 415 A.2d 1374, 1378 (D.C.1980)). The existence of mental illness alone does not suffice, as a defendant must establish "a causal relationship between the criminal conduct and his mental disease." *Pegues,* 415 A.2d at 1378.

■ However, "whenever the evidence suggests a substantial question of the defendant's sanity at the time of the crime," the trial court is required to conduct an inquiry which is "designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense." *Frendak v. United States,* 408 A.2d 364, 380 (D.C. 1979).

*Frendak* instructed trial courts to make a three-part inquiry whenever the defendant's mental condition at the times of the trial and the crime, respectively, is at issue: (1) whether the defendant is presently competent to stand trial; (2) if so, whether based on present mental capacity, the defendant can intelligently and voluntarily waive the insanity defense and has done so; or, if not, (3) whether the court *sua sponte* should impose the insanity defense based on evidence of the defendant's mental condition at the time of the alleged crime.

*Phenis,* 909 A.2d at 154 (citing *Anderson v. Sorrell,* 481 A.2d 766, 769 (D.C.1984)). The second prong is known as a *Frendak*

inquiry, which is "triggered by the circumstances of each individual case." *Phenis,* 909 A.2d at 154–55 (citing *Frendak,* 408 A.2d at 380).

The obligation to conduct a *Frendak* inquiry was not triggered here because 1) there was an uncontested, thorough productivity report which found appellant criminally responsible for the offense, and there was no other strong countervailing evidence to call the report into question; and 2) there was no causal link established between appellant's diagnosis of schizophrenia, catatonic type, and the crime.

The primary evidence of criminal responsibility was an uncontested productivity report issued on April 6, 2005 by Dr. Sweda, appellant's treating psychologist at St. Elizabeths Hospital, who had participated in appellant's examinations, diagnosis, and treatment since he was initially admitted in April 2004, a year prior to the issuance of the productivity report. We have held that the trial court's obligation to conduct a *Frendak* inquiry is not triggered where there is a "productivity examination in which an expert psychiatrist ha[s] rendered his opinion that [the defendant] was not insane at the time of the alleged offenses." *Robinson v. United States,* 565 A.2d 964, 967 (D.C.1989). This is true even where, as in *Robinson,* there was countervailing evidence that the defendant may have been insane at the time of the offense, including expert opinion that the defendant was suffering from a long-term paranoid disorder, the defendant's disruptive behavior at the jail and hospital, and two reports indicating that he

was not competent to stand trial. *See id.* To be sure, in *Phenis* we held that the trial court abused its discretion by failing to conduct a *Frendak* inquiry despite the existence of a productivity report finding Phenis criminally responsible. *See* 909 A.2d at 157. We distinguished *Phenis* from *Robinson* by noting the "key" factual difference: the reliability of the productivity report. We found that the *Phenis* productivity report was "conclusory," as it did not indicate "how much time the psychiatrist spent with appellant; what documents or records (including appellant's medical history, for example) were reviewed or considered, if any; or what was the basis for the conclusion that appellant was criminally responsible." *Id.* at 157. Furthermore, the report was "internally inconsistent," claiming both that Phenis did and did not suffer from a mental illness. *See id.* at 157.

This case is analogous to *Robinson* rather than *Phenis* in that the trial judge relied on a thorough, well-founded productivity report that did not suffer from the deficiencies we noted in *Phenis.* Here, the productivity report is not conclusory; it sets out the factual grounds for its findings and "is based on a large amount of information obtained from multiple sources," including appellant's actions during the crime and his own statements at the time of his productivity evaluation demonstrating that he understood the wrongfulness of his act at the time of the offense;[3] the circumstances of the crime;[4] and appellant's overall diagnosis. Significantly,

---

3. Dr. Sweda indicated in his report that during the evaluation, appellant made statements acknowledging "that he would have known that a carjacking was illegal at the time of the offense." Dr. Sweda also stated that appellant's attempts to elude police during the crime demonstrated his awareness of its illegality.

4. Dr. Sweda concluded that there was "nothing to suggest that appellant could not conform his behavior to the requirements of the law," as the crime appeared to be planned and organized, and appellant demonstrated no bizarre or unusual behavior at the time of the offense.

while in *Phenis* there was no indication of how much time the reporting psychiatrist spent with the defendant, in this case, Dr. Sweda had served as appellant's treating psychologist at St. Elizabeths Hospital for a year and was highly involved in his examinations, diagnosis, and treatment. Furthermore, the trial judge, based on his personal observations of appellant in the courtroom and the proceedings,[5] had no reason to question the productivity report where neither appellant's behavior nor other evidence raised a substantial question of his sanity at the time of the offense. *See Wallace,* 936 A.2d at 774 ("[W]e accord great deference to [a trial judge's] personal observations and conversations with appellant....")

Moreover, there was no obligation to conduct a *Frendak* inquiry in this case because there was no causal linkage between the mental illness with which appellant was diagnosed—schizophrenia, catatonic type—and the crime that would have caused the judge to have a substantial question whether appellant was criminally insane at the time of the offense. The insanity defense requires a showing of "a causal relationship between the criminal conduct and his mental disease." *Pegues,* 415 A.2d at 1378. In the productivity report, Dr. Sweda found that although appellant was mentally disordered, he did "not meet the linkage criterion of the insanity defense" because "his illness was not linked to his behavior during the carjacking." According to Dr. Sweda, the symptoms of appellant's illness are "mutism and non-responsivity to environmental stimuli" and "waxy flexibility" (doll-like positioning of the body). In his opinion, appellant "was certainly *not* catatonic at the time of

the offense." Dr. Sweda's report also specifically addressed the second prong of the definition of insanity, whether the defendant is able to "recognize the wrongfulness of his act or to conform his conduct to the requirements of the law." *Patton,* 782 A.2d at 312. In his report, he concluded:

> [Appellant] understood that the carjacking was wrong. His behavior at the time of the offense indicates he attempted to elude police pursuing him with activated emergency signals, and he continued to attempt to elude police on foot after he crashed the vehicle. This indicates he knew his behavior was criminal at the time of the offense. Further, during this evaluation he also acknowledged that he would have known that a carjacking was illegal at the time of the offense. He stated "I know the law. I know what's right and wrong. I'm not saying I did it no matter what. I'm not guilty. Common sense would say it's wrong. I just came out of prison. But I got nothing to explain. I know they got evidence but I'll take it to trial." Thus, the patient is simply denying involvement in the offense, rather than saying the behavior was somehow linked to his mental disorder.

In light of the productivity report and the absence of a causal relationship between appellant's mental illness and the offense, there was no substantial question of appellant's insanity, and the obligation to conduct a *Frendak* inquiry was never triggered.

### C. Show-up Identifications

 Appellant contends that the trial court's decision not to suppress the two

---

**5.** The trial judge found, based on his extensive personal observations and the evidence at the competency hearing, that appellant's lack of communication was "self-imposed as a result of the trial and how he thinks he might benefit as a result of not communicating," noting that appellant was "so intelligent that he could try to profit from his mental health issues in the context of this trial."

show-up identifications constituted reversible error, arguing that the identification procedures were unduly suggestive and unnecessary because the police had probable cause to arrest appellant without them. We disagree.

■■■■ "This court is bound by the trial court's findings on whether identification procedures were impermissibly suggestive and whether an identification was reliable 'if they are supported by the evidence and in accordance with the law.'" *Turner v. United States*, 622 A.2d 667, 672 n. 3 (D.C.1993) (quoting *Stewart v. United States*, 490 A.2d 619, 623 (D.C.1985)).[6] Although we recognize the inherent suggestivity when a single suspect in police custody is presented for identification (a "show-up"), we have held that "a prompt show-up identification 'enhances ... reliability' and serves a purpose to 'exonerate an innocent person who had been mistakenly apprehended.'" *Maddox v. United States*, 745 A.2d 284, 292 (D.C.2000) (quoting *United States v. Hunter*, 692 A.2d 1370, 1375 (D.C.1997)). A defendant who moves to suppress an identification must therefore show that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Forte v. United States*, 856 A.2d 567, 573 (D.C.2004) (citing *Turner*, 622 A.2d at 672 n. 4).

■■■■ As the trial judge found, the show-up identifications here were not unduly suggestive. Appellant points out that at the time of the show-ups, he was in custody, handcuffed, and placed under a police spotlight. However, "'something

more egregious than mere custodial status is required' to establish impermissible suggestivity," *Diggs v. United States*, 906 A.2d 290, 300 (quoting *Singletary v. United States*, 383 A.2d 1064, 1068 (D.C.1978)), and the fact that a suspect is handcuffed at the time of the identification does not itself render it impermissibly suggestive. *See id.* Appellant argues that the police unduly influenced one of the witnesses prior to the show-up by telling her that she was in the police car because she "had to ID the guy." We have held, however, that a show-up procedure is not unduly suggestive where, prior to identification, police officers tell the complainant "we got two guys in the car similar to the ones you told us about." *Singletary*, 383 A.2d at 1068. Here, the police gave no further indication to the witnesses as to why they thought they had caught the carjacker. Thus, appellant's custodial status and the officer's comment to the eyewitness did not render the show-up procedures used here unduly suggestive.

Appellant also asserts that the show-up identifications were unnecessary because police already had probable cause to arrest and prosecute him without the on-site identifications and the police should have used instead the more reliable police line-up. Appellant's argument is one based more on policy than law, and we have upheld show-up procedures that are not necessary for arrest because they generally render witness identifications more reliable. *See Maddox*, 745 A.2d at 293 (analyzing post-arrest show-up in hospital under same standard as one conducted to secure arrest). Here, while the police of-

6. Even where an identification procedure is deemed unduly suggestive, it will not be suppressed if the trial judge finds that it is nonetheless reliable. *See Stewart*, 490 A.2d at 622. For that reason we have "encouraged trial judges to conduct both steps of the inquiry into a challenged [] identification proce-

dure." *Henderson v. United States*, 527 A.2d 1262, 1269 (D.C.1987). Here, the trial judge did not make a separate finding that the identifications were reliable, and, as these are questions of fact, we are unable to rule on reliability. *See id.*

ficer who chased appellant was able to make an independent identification, he did not witness the carjacking, and also temporarily lost sight of appellant during the chase. The eyewitnesses, on the other hand, were able to observe the carjacking as it unfolded and see the perpetrator closely under favorable lighting conditions, so their identifications enhanced the government's case. Where the show-up identification procedures were likely reliable and there is no indication that they are being abused by the police officers or unduly suggestive, the fact that they were not absolutely necessary in order to secure arrest does not warrant their suppression. Thus, the trial court's denial of appellant's motion to suppress was not in error.

Appellant's convictions are

*Affirmed.*